# Kilpatrick *versus* The Commonwealth.

This court will take judicial notice, who are the judges of the subordinate state courts. Hibbs *v.* Blair, 2 *Harris* 417.

The two associate judges, learned in the law, of the Court of Common Pleas of Philadelphia county, are competent to hold a Court of Oyer and Terminer, under the Act of 3d February 1843. That act is constitutional.

Commonwealth *v.* Zephon, 8 *W. & S.* 382, affirmed.

Dying declarations are inadmissible, unless, at the time the declarant made them, he was in actual danger of death; unless he believed death was impending, not distant; and unless death actually ensued.

But it is not necessary they should be stated, at the time, to be made under a sense of impending death; it is enough, if it satisfactorily appear, in any mode, that they were made under that sanction.

If an unlawful killing be committed with a deadly weapon, and accompanied with an intent to take life, it is murder in the first degree; and if the party had time to reflect and form the design, it matters not how short that time may have been.

If a deadly weapon be used, the provocation must be very great to reduce the grade of crime from murder to manslaughter.

Commonwealth *v.* Mosler, 4 *Barr* 268, approved.

In the absence of circumstances, and evidence, that the blow was struck with the intent only to do great bodily harm, the law presumes an intent to kill, from the use of a deadly weapon.

To justify a conviction of manslaughter and not of murder, the death must have occurred in heat of blood, or on an immediate provocation, without previous malice.

What is sufficient cooling time after the provocation, to constitute the offence a murder, is to be judged of by the circumstances attending each particular case. The time in which an ordinary man, under, or in like circumstances, would have cooled, is a reasonable time.

Where the killing with a deadly weapon is admitted, and there is no pretence that the wound was not designedly given; it is not error to charge, that if the offence is not manslaughter, it is murder in the first degree, as the jury might find that it was committed deliberately and premeditatedly, or in hot blood. A judge may rightfully express his opinion respecting the evidence.

In case of reasonable doubt as to the guilt of the accused, evidence of previous good character is conclusive in his favour.

ERROR to the Oyer and Terminer of *Philadelphia.*

The plaintiff in error, John Kilpatrick, was indicted in the court below, for the murder of John McCracken, on the 20th October 1857. The prisoner was tried on the 10th March 1858, at a court of Oyer and Terminer, held by the Hon. JAMES R. LUDLOW and the Hon. JOSEPH ALLISON, the two associate law judges

of the Common Pleas of Philadelphia, under the provisions of the act of 3d February 1843; Judge LUDLOW having been duly appointed to hold the court, for the trial of all issues pending therein. On the 13th March 1858, the jury found the prisoner guilty of murder in the first degree; and on the 1st May, a motion for a new trial having been overruled, sentence of death was passed upon the defendant.

It appeared from the testimony in the cause, that the prisoner and the deceased were in the employment of one Alexander McElroy, and were engaged in hauling grain from the store of Greiner & Harkness, in Water street, to a wharf above Race street, in the city of Philadelphia. After having arrived at the wharf, a difficulty ensued between the prisoner and the deceased; they were, however, parted before any blows were struck; the deceased remarking that he did not want to strike him; to which the prisoner replied—"If you struck me, it would be the last man you'll strike in America."

The parties then returned to the store in Water street; the deceased first arrived, and was soon followed by the prisoner. The deceased proceeded to load his cart, at which the prisoner took offence, and a conflict ensued between them; the prisoner struck the deceased on the head with a piece of board, and knocked him against the side of his cart; from this, however, McCracken speedily recovered, and jerked the board out of the prisoner's grasp with one hand, whilst he seized him by the hair with the other, and struck him two or three blows about the head and face. The deceased was then dragged out of the cart by Kilpatrick, and, after a short struggle, they were again separated by the bystanders.

The son of their employer then directed the prisoner to go to his own cart, and the deceased to finish loading. Whilst he was so doing, the prisoner stood by his own horse's head, frequently uttering threatening language towards the deceased; his manner at 'the time, being described as cool and calm. The deceased, having finished loading, got down from his cart, and went to remove the prop which supported the shaft, when the prisoner ran at him, and stabbed him twice, in the abdomen and in the breast. The deceased was removed to the hospital, where he lingered for some time, but died of the wounds inflicted, on the 29th October 1857.

Dr. Morton, a physician of the Pennsylvania Hospital, having testified that he told the deceased his wounds were dangerous, but had never given him to understand that he was dying; and Thomas McCracken, a brother of the deceased, having testified that he visited the wounded man at the hospital, and that the deceased repeatedly said to him he was in a dying condition, and would never get up; the district attorney offered to prove the

[Kilpatrick *v.* The Commonwealth.]

declarations made by the deceased to his brother on the occasion of his visit, as a dying declaration. The admission of this evidence was objected to by the defendant's counsel; but it was admitted by the court, and a bill of exceptions sealed.

LUDLOW, J., charged the jury as follows:—"Murder at common law is, where a person of sound memory and discretion, unlawfully kills any reasonable creature in being, and in the peace of the Commonwealth, with malice prepense or aforethought, either express or implied. In Pennsylvania, we have a special statute, which, departing from the rule of the common law, expressly specifies wherein murder shall consist, and establishes two degrees or grades of crime, each of which are designated as murder; one as murder in the first, and the other as murder in the second degree.

" ' All murder perpetrated by means of poison, or lying in wait, *or by any other kind of wilful, deliberate, and premeditated killing,* or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder in the *first* degree; and all other kinds of murder shall be deemed murder of the second degree.' To constitute murder, either in the first or second degree, there must be a malicious intent upon the part of the party accused of having committed the offence; if this malicious purpose is coupled with an intent to kill, the offence is murder in the first degree; but if, actuated by malice, the prisoner did not intend to take life, but only to do great bodily harm, the offence, under our statute, is reduced to the grade of murder in the second degree.

" Malice (which it is to be observed, is an essential element in the crime of murder, either in the first or second degree, and without the existence of which, the crime of murder *cannot* be committed) is either express or implied; express malice is when one kills another with a sedate, deliberate mind and formed design; which design may be evidenced by external circumstances, discovering an inward intention, as by lying in wait, former grudges, menaces, and plans to do the party killed great bodily harm. Malice is implied by law from any deliberate and cruel act committed by one person against another.

" Where the act is committed deliberately, with a deadly weapon, and is likely to be attended with dangerous consequences, the malice requisite to murder will be presumed; for the law infers that the natural or probable effect of any act deliberately done, is intended by its actor.

" If the jury, in any case, believe that the crime of murder has been committed, that is to say, that the prisoner charged with the commission of the offence, has maliciously killed his victim, they must then inquire into the intent with which the act was com-

[Kilpatrick *v.* The Commonwealth.]

mitted; and if they believe that the act was perpetrated with intent to take life, and was wilful, deliberate, and premeditated, the offence will rise to the grade of murder in the first degree; otherwise it will be reduced to that of murder in the second degree.

" The intention of the prisoner is to be collected from his words and actions, and from the nature of the weapon used by the prisoner when he inflicted the blow.

" In the case of Commonwealth *v.* O'Hara, tried in 1797, the court held, that, if the murder be committed with an instrument likely to kill, it is wilful; and that, to make it deliberate and premeditated, the party must have time to reflect and to frame the design, however short the time may be, and *must* intend to kill; if the defendant has time to think, and did intend to kill for a moment, as well as an hour or a day, it is deliberate, wilful, and premeditated killing, constituting murder in the first degree.

" Judge RUSH cites this case in his charge to the jury, in the case of Richard Smith, tried many years ago in this city, and says : ' That the principles just stated (and which I have just quoted), are from the highest judicial authority in Pennsylvania, and it is the duty of this court, and of you, to submit to them.'

" We unhesitatingly adopt these rules of law, as principles by which you are to be governed; to the correct application of these principles to particular cases, by courts and juries, must the community look for that protection to which they are entitled; and an enlightened and conscientious jury will never wrest them to the destruction of innocent men.

" The counsel for the prisoner in the present case contend, that if a crime has been committed, it amounts to nothing more than manslaughter. What then is manslaughter? Manslaughter is the unlawful and felonious killing of another, without malice, either express or implied. Voluntary manslaughter is the unlawful killing of another, without malice, on a sudden quarrel, or in the heat of passion. The law does not allow one man to kill another, no matter under what circumstances of provocation he may have committed the act. A homicide thus perpetrated, is neither excusable nor justifiable, but the law, in mercy, reduces the offence from that of murder to voluntary manslaughter; though, should one kill another suddenly, without any or a considerable provocation, the law implies malice, and the killing is murder; but if the provocation were great, the offence would be manslaughter, and not murder.

" To determine whether a killing is murder or manslaughter, the instrument wherewith the homicide is committed must be taken into consideration; for, if a deadly weapon is used, the provocation must be very great to reduce the grade of crime from murder to manslaughter. So, also, the late Chief Justice GIBSON has said, in a case tried in this very court-room, before him and

[Kilpatrick *v.* The Commonwealth.]

his associate judges of the Supreme Court, 'that to reduce the offence to manslaughter, it is necessary that a quarrel should have taken place, and blows have been interchanged, between parties, in some measure, upon equal terms of strength and condition for fighting, and this without regard to the question, who struck first? Yet, this must be taken with some grains of allowance. If a man should kill a woman or a child for a slight blow, the provocation would be no justification.' And the same eminent judge has also said, 'when a blow is cruel or unmanly, the provocation will not excuse it; and the same law exists where there was a previous quarrel, and the killing was on an old grudge:' Commonwealth *v.* Mosler, 4 *Barr* 268. Stedman's Case has been referred to by the counsel for the prisoner; now Chief Justice GIBSON has shaken the authority of the decision in that case, by his remarks upon it in Commonwealth *v.* Mosler, already cited, for he says: 'Under this view of the law, I have always doubted Stedman's Case, in which, for a woman's blow on the face with an iron patten, given to a soldier in return for words of gross provocation, he gave her a blow with the pommel of his sword on her breast, and then ran after her and stabbed her in the back, and the crime was held to be only manslaughter.' It is, perhaps, unnecessary to add anything to the opinion of the late chief justice thus expressed; and yet, as living judges, we are bound to say that we entirely concur in it.

"To justify a conviction of manslaughter, and not murder, the death must have occurred in heat of blood, or on an immediate provocation—there having been no previous malice. But no matter what may have been the provocation, if there be sufficient time for the passion to subside, and for reason to interpose, called in the law 'cooling time,' the homicide will be murder, either in the first or second degree, as the jury, from the evidence, believe the blow to have been inflicted wilfully, deliberately, and premeditatedly, with intent to take life, or simply with malicious intent to do great bodily harm. What is sufficient cooling time, has never been definitely determined by judicial interpretation or decision, and the question must be settled by the circumstances attending each particular case. It has been said, that the time in which an ordinary man, under or in like circumstances, would have cooled, may be said to be reasonable time, and this rule we adopt in the present case. If the prisoner is lashed into ungovernable passion by recent provocation, *so strong* as to destroy all self-control, and is not 'the master of his own understanding;' and if, in this condition of mind, he inflicts a blow, from which death ensues, with an instrument which happens to be near him, or in his possession, the offence will clearly be but manslaughter.

"But if a prisoner betrayed thought, contrivance, and design, in the mode of possessing himself of the weapon, or being in

possession of a deadly weapon, uses it with circumstances clearly indicating a wilful, deliberate, and premeditated design, with which he inflicted the blow, and again replaced it immediately after the blow was struck, such exercise of contrivance and design denotes rather the presence of judgment and reason, than of violent, ungovernable passion. If two combats rapidly succeed each other, the question, how far the grade of the offence, apparently committed in the second combat, will be mitigated by the previous combat, will depend, first, upon the view which the jury take of the two combats, being in fact but one and the same; and, secondly, upon the view which the jury may take of the first combat, having been so recent as to have furnished a reasonable and sufficiently strong and sudden provocation for either a second combat, or for a subsequent attack, producing a contest not entitled to be called a mutual combat.

"Intoxication is no excuse or palliation for crime, and, at best, it can but reduce the grade. If the jury believe that a prisoner is in such a state of mind, produced by excessive drink, as to be unable to form a wilful, deliberate, and premeditated design to kill, it may lower the grade from murder in the first to murder in the second degree. Intoxication, if it exists, can only be taken into consideration in deciding upon the malice or intention of the offender. The most important question, therefore, for you to decide is, whether the prisoner, John Kilpatrick, inflicted the blow in one of three methods:

"1. Wilfully, deliberately, and premeditatively, with intent to take life,—if he did so, he is guilty of murder in the first degree.

"2. Did he inflict the blow maliciously, and with intent not to take life, but to do great bodily harm,—if so, he is guilty of murder in the second degree.

"3. Did he inflict the blow with a design and purpose to kill, in the heat of passion, or upon a sudden quarrel, and without malice,—if so, he is guilty of manslaughter, unless he had sufficient time to cool, and reason and judgment had taken possession of his mind,—in that event, and if the jury so believe from the evidence, he might yet be guilty of murder in the first or second degree, notwithstanding there had been a sudden quarrel, or the prisoner had previously acted in the heat of passion."

The learned judge here recapitulated, and commented on the evidence in the cause, and proceeded:—

"From this evidence, gentlemen of the jury, you will observe, that the final conflict, in which the deceased received his death wound, could not have occupied a period of time less than three, nor more than six minutes.

"We have thus, gentlemen, reviewed the testimony in this cause, with the exception of that which refers to the character of

[*Kilpatrick v.* The Commonwealth.]

the prisoner, of which we shall speak hereafter, and we will neither temporize nor equivocate in a cause of this magnitude.   The court are of the opinion, from their view of the facts of this case, that if the offence with which this prisoner is charged, is not man- slaughter, it is murder of the first degree, as the jury believe from the evidence that the act was committed in the heat of blood, or upon a sudden quarrel, or with coolness and deliberation.   There has been submitted to you, evidence touching the good character of the prisoner, and this evidence proves him to have maintained an excellent reputation; originally, evidence of good character was not allowed to go to the jury, when there was positive proof of the commission of an offence, for if one was seen to commit a murder with deliberation, though he had borne an irreproachable character, and were even an angel, he would yet be guilty.   The rule of law in this state, however, permits evidence of good cha- racter to be submitted to the jury, in every case of homicide, no matter what may be the other testimony in the cause.

" But, gentlemen, when a doubt suggests itself to your minds as to the prisoner's guilt, upon the facts of the case as presented by the evidence, the law casts the whole weight of the prisoner's former good character into mercy's scale, and settles the question in favour of the accused.

" What then is a doubt?   It is not sufficient for the prosecution to establish a *probability*,. ' the evidence must establish the truth to a reasonable certainty, it must convince and direct the under- standing, and satisfy the reason and judgment of those who are bound to act conscientiously upon it;' a doubt, such as the law . recognises, is not a figment of the imagination, but something which, upon a candid and conscientious examination of the evidence in the case, would lead a man of common sense, if he were dealing with the ordinary business of life, and in his own affairs, seriously to pause before coming to a conclusion.

" If such a doubt exists in this case, the prisoner is entitled to the benefit of it.

" Gentlemen, the Act of Assembly requires me further to say, that if you find the defendant guilty of murder, you must ascertain, and say by your verdict, whether it be murder of the first or second degree.

" We have now concluded our remarks to you, both upon the law and the evidence.   You will retire from this court, and give to this case the consideration which it imperatively demands. You are to be governed by the law and the evidence alone, recol- lecting that you have sworn to do your duty, both to the Common- wealth and the prisoner."

The jury, after having retired, returned, and proposed the fol- lowing question to the court, viz. :—

" If a person uses a deadly weapon, after a provocation, but

[Kilpatrick v. The Commonwealth.]

had a sufficient time to cool or reflect, with the intention to do great bodily harm, not caring whether he causes death or not, is it murder in the first degree ?"

To which the learned judge gave the following answer:—

"If, from the circumstances of the case, and the evidence in the cause, the jury believe that the intent with which the blow was struck was not to take life, but simply to do great bodily harm, the grade of murder would be reduced from murder in the first degree, to murder in the second degree; but, in the absence of circumstances and evidence in the cause which would induce the jury to believe that the blow was struck with the intent only to do great bodily harm, the law presumes an intent to kill, from the use of a deadly weapon, no matter upon whom the blow falls."

The defendant, having been convicted of murder in the first degree, applied for and obtained a writ of error to remove the cause to this court, and filed the following specification of errors:—

1. Because it appears by the said record, that the above case was tried by the Honourable James R. Ludlow and Joseph Allison, neither of whom was the President of the Court of Common Pleas; and therefore, the said judges had no constitutional right or jurisdiction to hold the said court, and try the said case; and that the entire proceedings are, therefore, void and *coram non judice*.

2–5. These errors were abandoned on the argument.

6. Because the learned judge erred in the admission of alleged dying declarations, proved by Thomas McCracken, brother of the deceased, whereby the defence of the prisoner was injuriously and illegally affected, and to which the counsel of the prisoner excepted.

7. Because the court erred in adopting specifically and fully the construction placed by, Chief Justice McKean and Judge Rush upon the Act of Assembly of 1794; which, it is respectfully submitted, was contrary to the true interpretation of the said Act of Assembly.

8. Because the court erred in charging the jury, that Stedman's Case, which had been referred to by the counsel for the prisoner, had been shaken as authority by Chief Justice Gibson, in the case of Mosler, 4 *Barr* 268; and in further charging that, as living judges, "we entirely concur in this opinion in the case of Mosler."

9. Because the court erred in charging the jury thus: "The court are of opinion, from their view of the facts of this case, that if the offence with which the prisoner is charged is not manslaughter, it is murder in the first degree, as the jury believe that the act was committed in the heat of blood, or upon a sudden quarrel, or with coolness and deliberation."

10. Because, after retiring, the jury having come into court the next day, proposed the following question to the court:—"If a person uses a deadly weapon, after a provocation, but had a suffi-

[Kilpatrick *v.* The Commonwealth.]

cient time to cool or reflect, with intention to do *bodily harm*, not caring whether he caused death or not, is it murder in the first degree?" To which the learned judge answered (and which answer is erroneous, and the subject of the present exception) as follows:—" If, from the circumstances of the case, and the evidence in the cause, the jury believe that the intent with which the blow was struck was not to take life, but simply to do great bodily harm, the grade of crime would be reduced from murder in the first, to murder in the second degree; but, in the absence of circumstances and evidence in the cause, which would induce the jury to believe that the blow was struck with intent to do great bodily harm, the law presumes an intent to kill, from the use of a deadly weapon, no matter upon whom the blow falls."

11. Because the learned judge erred in his charge to the jury on the subject of cooling time.

12. Because the learned judge erred in point of law, in instructing the jury thus:—" The evidence proves the defendant to have borne an excellent reputation; originally, evidence of good character was not allowed to go to the jury, when there was positive proof of the commission of an offence, for if one was seen to commit a murder with deliberation, although he had borne an irreproachable character, and were even an angel, he would yet be guilty; the rule of law in this state, however, permits evidence of good character to be submitted to the jury in every case of homicide, no matter what may be the other testimony in the cause. But when a doubt suggests itself to your minds, as to the prisoner's guilt, upon the facts of the case, as presented by the evidence, the law casts the whole weight of the prisoner's former good character in mercy's scale, and settles the question in favour of the accused. What then is a doubt? It is not sufficient for the prosecution to establish a probability, the evidence must establish the truth to a reasonable certainty; it must convince and direct the understanding, and satisfy the reason and judgment of those who are bound to act conscientiously upon it; a doubt, such as the law recognises, is not a figment of the imagination, but something, which, upon a candid and conscientious examination of the evidence in the case, would lead a man of common sense, if he were dealing with the ordinary business of life, and in his own affairs, seriously to pause before coming to a conclusion. If such a doubt exists in this case, the prisoner is entitled to the benefit of it."

*David Paul Brown*, *Goforth*, and *Palethorp*, for the plaintiff in error.—The Act of 1843, under which the court was held by the two associate judges, is in conflict with the Constitution, Art. 5, § 4, which provides " that the judges of the Courts of Common Pleas shall be justices of oyer and terminer and general jail deli-

[Kilpatrick *v.* The Commonwealth.]

very, for the trial of capital and other offenders therein; any two of the said judges, *the president being one*, shall be a quorum."

At the last session of the legislature a bill passed both houses of the General Assembly, providing that any two of the judges of the Court of Common Pleas of Lancaster county, one of them being learned in the law, should have power to try all indictments in the oyer and terminer. But this bill was vetoed by the present Executive, on the ground that it conflicted with the Constitution: *Veto Message*, 12*th April* 1858. See, also, the opinion of C. J. LOWRIE, in 15 *Leg. Int.* 188; Commonwealth *v.* Flanagan, 7 *W. & S.* 68; Commonwealth *v.* Zephon, 8 *Id.* 382; 2 *Hale P. C.* ch. 1, 4, 5, 6, 27.

The alleged dying declarations were improperly admitted; they were not made under an impression of almost *immediate* dissolution, which is necessary to give them the same sanction as if made on oath: Rex *v.* Drummond, 1 *Leach C. C.* 337; 1 *Stark Ev.* 32; Rex *v.* Pike, 1 *C. & P.* 598; Rex *v.* Woodcock, 1 *Leach C. C.* 502; Rex *v.* Hucks, 1 *Stark. R.* 424; Rex *v.* Van Butchell, 3 *C. & P.* 629; 1 *East C. L.* 353; Rex *v.* Reason, 1 *Str.* 499; Rex *v.* Ashton, 2 *Lew. C. C.* 149; Rex *v.* Crockett, 4 *C. & P.* 542; Ealing's Case, 12 *Vin. Abr.* 118; Sussex Peerage Case, 11 *Cl. & Fin.* 108; Rex *v.* Spilsbury, 7 *C. & P.* 187; Rex *v.* Gray, *Irish Cir. R.* 76; Rex *v.* Christie, 2 *Russ. on Cr.* 754; Rex *v.* Fugent, 7 *C. & P.* 238; Vass *v.* Commonwealth, 3 *Leigh* 786; Smith *v.* The State, 9 *Humph.* 24; Rex *v.* Ehrington, 2 *Lew. C. C.* 148; Wilson *v.* Boerem, 15 *Johns.* 286; Lambeth *v.* The State, 23 *Miss.* 323, 354; Commonwealth *v.* Williams, 2 *Ash.* 69; 1 *Taylor Ev.* 504; Bartlett *v.* Smith, 11 *M. & W.* 483, 486; The State *v.* Poll, 1 *Hawks* 442, 444; Hill *v.* Commonwealth, 2 *Gratt.* 594; Commonwealth *v.* Murray, 2 *Ash.* 41; Wright *v.* Littler, 3 *Burr.* 1244; McDaniel *v.* The State, 8 *Sm. & M.* 416; 1 *Greenl. Ev.* 158; Rex *v.* Hayward, 6 *C. & P.* 160.

The court below erred in adopting Judge Rush's construction of the Act of 1794. The words, "*wilful, deliberate, and premeditated killing*," imply something more than "malice aforethought," which was what constituted the crime of murder at common law. The intent of the legislature was to distinguish between cases of murder upon provocation or excitement, not sufficient to reduce the crime to the grade of manslaughter, and those committed in cold blood, and with deliberate and premeditated malice.

The court took from the jury the question as to the grade of offence committed by the prisoner, by a binding charge that it was either murder in the first degree or manslaughter. The question, whether it was murder in the first or second degree, was not submitted to them, which was error: Pennsylvania *v.* Hanneman, *Add.* 149; 11 *Wheat.* 75; *Coke Litt.* 153 *b*, note 5; *Id.* 71 *b*.

[Kilpatrick *v.* The Commonwealth.]

It was error to charge that the law presumes an intent to kill from the use of a deadly weapon. In England, the presumptions are against the prisoner, and he must rebut them; but, in Pennsylvania, they are in favour of the prisoner, and the Commonwealth must remove or overcome them: Commonwealth *v.* O'Hara, 7 *Smith's Laws* 694; McDaniel *v.* The State, 8 *Sm. & M.* 401; 1 *Russell* 388; *Foster* 253; Woodsides *v.* The State, 2 *How.* (Miss.) 655; Lambeth *v.* The State, 23 *Miss.* 322.

Malice is a technical expression, meaning absence of any excuse for homicide: Pennsylvania *v.* Lewis, *Add.* 283; Commonwealth *v.* Murray, 2 *Ash.* 41; Commonwealth *v.* Williams, *Id.* 69; Woodcock's Case; *Foster* 253, 256–257, 277, 291, 297, 355, 357, 395; 4 *Bl. Com.* 199; 1 *Hale P. C.* 456, 378, 432–433; 1 *Hawk. P. C.* 188, 378; 1 *Russell,* 513, 516, 518, 523, 580, 583, 585, 587; *Bacon,* tit. Murder, 19; 1 *Hogan* 429; 2 *Str.* 773; *Add.* 282–283, 163, 248, 256; 2 *Ash.* 73–74; 1 *Hawk. P. C.* § 30, p. 97; Commonwealth *v.* Mosler, 4 *Barr* 264; Commonwealth *v.* Harman, 4 *Barr* 270.

When a legal provocation is proved, intoxication may be taken into consideration to ascertain whether the slayer acted from malice or from sudden passion excited by the provocation: Rex *v.* Meakin, 7 *C. & P.* 297; Rex *v.* Thomas, 7 *C. & P.* 817; 1 *Rus. on Crimes* 8; State *v.* McCants, 1 *Speers* 384; Pennsylvania *v.* Fall, *Add.* 257. The mental state required for the crime of murder being one of deliberation and premeditation, the fact of the prisoner's drunkenness was material, not as an excuse for the crime, but to show it had not been committed: The State *v.* Bullock, 13 *Ala.* 413. Perhaps this case may have gone too far in refusing to allow drunkenness any weight upon the question of intention: Schaller *v.* The State, 14 *Miss.* 502; State *v.* Thompson, *Wright* 617. The fact of drunkenness may reduce a homicide from murder to manslaughter: Swan *v.* The State, 4 *Humph.* 136; Pirtle *v.* The State, 9 *Humph.* 570; Haile *v.* The State, 11 *Humph.* 154; Commonwealth *v.* Jones, 1 *Leigh* 612; Commonwealth *v.* Haggerty, 1 *Lewis C. L.* 403–405.

There was error also in the charge of the court as to cooling time. The principle, as laid down in *Wharton's Criminal Law,* is, " However great the provocation may be, if there be time for passion to subside and reason to interpose, the homicide would be murder." "In killing, whether blood had time to cool is a question for the court:" Regina *v.* Fisher, 8 *C. & P.* 182. The law assigns no time within which cooling time may be said to take place: Commonwealth *v.* Dougherty, 7 *Smith's Laws* 605; State *v.* McCants, 1 *Speers* 384. Was the wound given while smarting under wrong so recent and strong as not to be master of his own understanding? if so, the crime can be but manslaughter: Rex *v.* Hayward, 6 *C. & P.* 157; Rex *v.* Lynch, 5 *C. & P.* 324; 1 *Hawk. P. C.* § 30, p. 97; 1 *Hall* 453. If thought, contrivance, or provocation

[Kilpatrick v. The Commonwealth.]

shown: Rex v. Kirkham, 8 *C. & P.* 115; State v. Norris, 1 *Hayw.* 429; People v. Garretson, 2 *Wheeler C. C.* 347; *Foster* 297; 1 *Hall* 432, 433; 2 *Str.* 773; 1 *Russ. on Crimes* 525; Rex v. Kelly, 2 *Car. & Kirw.* 814; *Townsend's Mod. State Trials* 151. Drunkenness is held proper for consideration where the sole question is whether the act done was premeditated, or done only with sudden heat and impulse: Kelly v. The State, 8 *Sm. & M.* 518; Regina v. Moore, 3 *Car. & Kirw.* 319; Regina v. Doody, 6 *Cox C. C.* 463.

In regard to the weight to be given to evidence of character, they cited *Whart. on Homicide* 245; 2 *Russ. C. L.* 85; 2 *Mass.* 317, 318; 7 *C. & P.* 373.

*Loughead* and *Mann*, District Attorneys, for the Commonwealth.—The maxim of *stare decisis* applies with peculiar force to the constitutional objection raised to the jurisdiction of the court. The very point was raised and decided in Commonwealth v. Zephon, 8 *W. & S.* 382; and that case was affirmed in Commonwealth v. Martin, 2 *Barr* 244; Commonwealth v. Ford, 5 *Id.* 67; In re Pennsylvania Hall, *Id.* 204; In re Northern Liberty Hose Company, 1 *Harris* 194.

The law in regard to dying declarations is correctly cited by the prisoner's counsel; their only difficulty is that its full requirements were complied with. It does not affect the question that the deceased did not actually die till the ninth day after: Woodcock's Case, 1 *Leach C. C.* 500; Tinckler's Case, 1 *East P. C.* 354; Rex v. Mosely, 1 *Moody C. C.* 97; Rex v. Benner, 6 *C. & P.* 386; *Bennett & Heard's Lead. Cr. Cas.* 236.

The charge of the court as to the construction of the Act of 1794 is fully sustained by the cases of Respublica v. Mulatto Bob, 4 *Dall.* 146; Commonwealth v. O'Hara, 7 *Smith's Laws* 694; Commonwealth v. Richard Smith, *Whart. on Homicide* 389; Commonwealth v. Green, 1 *Ash.* 289; Commonwealth v. Williams, 2 *Id.* 69; The State v. Spencer, 1 *Zabr.* 196; Commonwealth v. Murray, 2 *Ash.* 41; Commonwealth v. Daley, *Whart. on Homicide*, 466; Commonwealth v. Jones, 1 *Leigh* 610; *Whart. Cr. L.* 563.

Throughout the whole charge the three degrees of felonious homicide were kept before the jury; and it was impressed upon them, that they were to determine the grade of the offence from the evidence. In Commonwealth v. Green, 1 *Ash.* 289, the court went much further, and instructed the jury that the court was of opinion that the offence was one of murder in the first degree.

The counsel for the Commonwealth can see no error in the instruction as to what was sufficient cooling time, nor as to the weight to be given to evidence of good character. On these points it was as favourable to the prisoner as was warranted by the circumstances of the case.

[Kilpatrick *v.* The Commonwealth.]

The opinion of the court was delivered by

STRONG, J.—This record presents several questions of the gravest importance. We are not insensible to their magnitude. Involving, as the case does, principles which lie at the basis of the administration of criminal justice, and possibly affecting human life, we have given it our most careful consideration.

The principal questions relate to the constitution of the court in which the indictment was tried, and to the instruction which was given to the jury. There are other minor things, which we shall not overlook.

The record exhibits that, at a court of Oyer and Terminer for the city and county of Philadelphia, John Kilpatrick, the defendant, was indicted, tried, convicted of murder in the first degree, and sentenced. The first assignment of error is that " it appears by the record that the case was tried by the Hon. James R. Ludlow and Joseph Allison, neither of whom was the President of the Court of Common Pleas; and therefore the said judges had no constitutional right to hold the said court and try the said case; and that the entire proceedings are void and *coram non judice.*"

Upon the argument in this court a doubt was suggested, whether this question is raised by the record. The doubt was not without reason. Personally we know that Judges Ludlow and Allison are associate justices of the Court of Common Pleas, learned in the law, and that neither of them is the president of that court. Yet can we judicially take notice of the fact, that neither of them is the president of that court, when the defendant did not deny it by plea, and when the record does not show it; but, on the contrary, avers that the trial took place at a court of Oyer and Terminer? Doubtless, there are many things of public interest, things which ought generally to be known, of which courts will take notice without proof. But whether a superior court is bound to know who are the judges of subordinate courts, and what is the nature of their commissions, is by no means clearly settled. In the English courts, it has been held, that such facts a court cannot be presumed to know. In Skipp *v.* Hooke, 2 *Strange* 1080, a writ of error from the King's Bench to the Common Pleas, it appeared that the placita was for the end of the term, before Sir John Willes and his brethren: the writ was returned, " Teste Philip, Lord Hardwick." It was objected that the writ ought to bear teste in the name of Sir John Willes. To which it was answered that though the court had a private knowledge who was Chief Justice of the Common Bench at that time, yet they could not judicially take notice of it, and Lord Hardwick might be Chief Justice in Easter term when the writ issued. Besides, it was an exception to reverse a judgment, in which case the court will never go out of the record, and that the proper place to take advantage of irregularity was by motion in the Common Bench. Of this

[Kilpatrick v. The Commonwealth.]

opinion was the court, and the judgment was affirmed. This case was followed by Van Sandau v. Turner, 6 *Ad. & Ellis*, N. S., 773, in which Lord DENMAN declared that the Court of Queen's Bench did not accede to the proposition that they were bound to take notice of the fact that a certain person was a judge of an inferior court.

In the American courts the question is still an open one, though it has not often arisen. In Ripley v. Warren, 2 *Pick.* 592, the Supreme Court of Massachusetts declared, that whether the court must know who are the justices or the chief justices of inferior tribunals certainly admits of question. In Louisiana, it appears to have been ruled, that superior courts are presumed to have such knowledge; 3 *Louis.* 13, Follain v. Lefevre. In Pennsylvania, the question is not known ever to have arisen.*

Notwithstanding the doubts, however, which have elsewhere entertained in similar cases, we are disposed to take judicial notice of the facts that, at the time of the trial in the court below, Judge Thompson was President Judge of the Court of Common Pleas of Philadelphia county, and that Judges Ludlow and Allison, though justices learned in the law, were only associates. The rule is, that courts will take notice of what ought to be generally known within the limits of their jurisdiction. There seems to us, to be as much reason for our having knowledge of who are in fact the judges of our constitutional courts, as for our having judicial knowledge of the heads of departments, sheriffs, &c.; knowledge of whom is always presumed.

We come therefore directly to the inquiry whether two associate judges of the Court of Common Pleas of Philadelphia— commissioned as such, though learned in the law, can hold a court of Oyer and Terminer within that county. The objection is, that the constitution makes the presence of the President of the Common Pleas, essential to the existence of a court of Oyer and Terminer. We shall be aided in our examination of this objection, by a reference to the constitution of 1790, as well as to the amended one of 1838. The fifth article of the constitution of 1790, section 4th, provided for the establishment of Courts of Common Pleas. It ordained that *until it should be otherwise directed by law*, the several Courts of Common Pleas should be established in the following manner. The governor should appoint in each county not fewer than three, nor more than four judges. The state should be divided by law into circuits, none of which should include more than six, nor fewer than three counties. A president judge should be appointed in each circuit. The president and judges, any two of whom should be a quorum, should

---

* See Hibbs v. Blair, 2 *Harris* 413, 417.

[Kilpatrick *v.* The Commonwealth.]

compose the respective Courts of Common Pleas. The fifth section of the same article ordained in these words: "The judges of the Courts of Common Pleas in each county, shall, by virtue of their offices, be justices of Oyer and Terminer and general gaol delivery, for the trial of capital and other offenders therein. Any two of the said judges, the *president* being one, shall be a quorum." Two things are noticeable in this constitution. It made provision *de novo* for the establishment and organization of the Courts of Common Pleas, and it does not appear to have been contemplated that any other judges of those courts than the president might be learned in the law. Indeed the phrase " learned in the law" is not to be found in the instrument. Although the establishment and mode of organization of the Courts of Common Pleas were thus prescribed, yet the constitution recognised the power of the legislature to make changes in both. Accordingly, such changes were made. without objection. The legislature reduced the number of judges in each county to two. They formed circuits containing less than three counties. They enacted that there should be four judges of the Court of Common Pleas of Philadelphia, that one of the associates should be a judge learned in the law, and that such an associate might hold a court alone, although two other judges might be holding court at the same time. The same power was also conferred upon the president judge, and this, notwithstanding the provision of the constitution of 1790, that " the president and judges, any two of whom should be a quorum, shall compose the respective Courts of Common Pleas." This legislation was not. supposed to be in conflict with the constitution, but was regarded as fully authorized by the provision that the Courts of Common Pleas should be established as designated, *until it should be otherwise directed by law.*

Were it necessary to seek for a reason, why the framers of the constitution of 1790 introduced the provision that any two of the judges of the Common Pleas, the president being one, should be a quorum of the Oyer and Terminer, it might doubtless be found in the design to give to that court the benefit of a judge learned in the law. When the constitution was made, it was not contemplated, that any other than the presidents, would be law judges, for as has been said, the phrase, learned in the law, is not used in the instrument. The purpose of the framers was, therefore, accomplished, by the provision, that the president should be one of the quorum. Yet, as has already been observed, the legislature were empowered to enact other directions, respecting the establishment of the several Courts of Common Pleas.

The amended constitution of 1838 was then adopted. The first section of the fifth article remains unchanged. The second section makes provision for the appointment, tenure, and compensation of the judges. The third section is as follows :—" Until

[Kilpatrick *v.* The Commonwealth.]

otherwise directed by law, the Courts of Common Pleas shall continue as at present established. Not more than five counties shall, at any time, be included in one judicial district for said courts." The fifth section is a transcript of the same section in the constitution of 1790. It ordains, that the judges of the Court of Common Pleas, in each county, shall, by virtue of their offices, be justices of Oyer and Terminer and general gaol delivery, for the trial of capital and other offences therein. Any two of the said judges, the president being one, shall be a quorum. The present constitution did not, like the former, attempt to establish Courts of Common Pleas. It adopted those already in existence, subject, as they had always been, to the power of the legislature to make changes in their organization as well as in their powers. What constitutes a quorum, belongs to the organization, and the legislature has the same power over it, under the amended constitution, that they had under the former. Under that, as we have seen, they made one judge competent to hold a Court of Common Pleas, and their action was not denied to be constitutional. It is not easy to see, why the number of judges, two, is not as necessary to form a constitutional quorum, as is the presence of the president judge. Yet it will not be questioned, that the legislature can constitutionally so modify the Courts of Common Pleas as to increase or diminish the number of associate judges, and increase the number necessary to form a quorum.

Such being the power of the legislature, over the organization of the Courts of Common Pleas, we proceed now to inquire how far it has been exercised.—On the 25th of February, A. D. 1840, an Act of Assembly was passed providing for the establishment of the Court of General Sessions for the city and county of Philadelphia. Upon this court, were conferred all the powers and privileges which belong to the courts of Oyer and Terminer in the several counties of this Commonwealth. The second section enacted, that any one of the judges should have full power and authority to hold the said court for the trial of all indictments (excepting in cases of homicide, when there should be two of the said judges).

On the 3d of February 1843, the legislature abolished this court, and conferred all its powers, jurisdiction and authority upon the Court of Oyer and Terminer, General Gaol Delivery, and Court of Quarter Sessions of the Peace in and for the city and county of Philadelphia. The second section of the act directed the appointment of an additional associate judge of the Court of Common Pleas, who should be learned in the law. This was done, and the constitution of the court was thus changed. The number of associates was increased from two to three, and all of them were law judges. The third section provided that the Court of Oyer and Terminer, &c., of Philadelphia, thus con-

[Kilpatrick *v.* The Commonwealth.]

stituted, should hold six terms in each year. The fourth section enacted, that any one of the judges of said court shall have full power and authority to hold said court for the trial of all indictments, except in cases of homicide, when there shall be two of said judges. The fifth section enacted, that at least ten days before the term, or at the commencement of the year, the court shall decide which of the judges shall hold the Courts of Oyer and Terminer; and in all cases in which two judges are required to try a case, the judge holding the court shall select one of the others to hold the court with him, and the said judge who it has been decided shall hold the court, shall preside during the session.

If this Act of Assembly be such as the legislature had constitutional authority to enact, than it is clear, that the court by which the plaintiff in error was tried was legally formed. The act is not an attempt to establish a new court, which the legislature are authorized to do by the first section of the fifth article. If it be valid at all it is because it is a reorganization of the existing Court of Common Pleas, under the clause of the constitution which ordains, that "the Courts of Common Pleas shall continue as at present established, *until otherwise directed by law*." The plaintiff in error denies that the act is constitutional. We cannot regard this as an open question. Whatever doubts we might have, were the question *res nova* (and, speaking for myself, I should have many), we are not now at liberty to entertain them. The validity of this Act of Assembly, as well as the intent of the constitutional provisions, have heretofore been authoritatively defined. In Commonwealth Zephon, 8 *W. & S.* 382, the enactment was ruled to be constitutional, and it was held, that in the city and county of Philadelphia, a Court of Oyer and Terminer may be properly holden by two associate judges of the Court of Common Pleas. That case has since been repeatedly recognised as binding authority. See Commonwealth *v.* Martin, 2 *Barr* 244; Commonwealth *v.* Ford, 5 *Barr* 209; Northern Liberty Hose Company, 1 *Harris* 196. It has also been followed by practical consequences. In reliance upon it, the Oyer and Terminer of Philadelphia has continued to be constituted by two associate judges. Before such courts we are informed indictments for homicide have been tried, and there have been numerous convictions. In some of the cases, sentence of death has been passed and executed, and in others, the convicts are now undergoing imprisonment. It is too late for us to declare The Commonwealth *v.* Zephon is all wrong, and that the act of 1843 was in conflict with the constitution. Adopting the language of the court in Commonwealth *v.* Martin, nothing less than an imperative case would justify us in disregarding an act of the legislature at the expense of throwing open the jails and turning loose upon the community the malefactors convicted in a course of years.

[Kilpatrick v. The Commonwealth.]

There is an obvious distinction between the duties of this court and those of the legislature. While the law-making branch of the government should avoid the exercise of doubtful powers, with us the presumption ought to be that they have not transcended the limits of their legitimate authority. It must be a clear and unequivocal case, which will justify us in declaring an Act of Assembly unconstitutional, and more especially when its constitutionality has been affirmed by our predecessors, and relied upon in practice.

The second, third, fourth, and fifth assignments of error have not been pressed in the argument, and we have not discovered in what particulars, error was committed.

The sixth exception relates to the admission of what are called dying declarations. Undoubtedly, such declarations are inadmissible, unless at the time the declarant made them he was in actual danger of death; unless he believed death was impending, not distant; and unless death actually ensued. All these requisites seem to have existed in the present case. The only possible question is, whether the admitted declarations were made under a sense of impending death. It is not necessary that they should be stated at the time to be so made: 1 *Greenleaf Ev.* 158. It is enough, if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved, by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind. When the declarations admitted here were made, the proof is, that McCracken, the declarant, appeared to be in a dying condition, as if he could not live many minutes. He said he was in a dying condition, and that he would never get up, and made arrangements for his burial. Surely, this was sufficient evidence of a sense of impending dissolution. We cannot, therefore, say there was error in admitting the evidence.

The remaining errors assigned relate to the charge of the court, and (with the exception of the twelfth) may properly be considered together. The principal objection to the charge is, that the court below adopted the construction which was given to the Act of 1794, by Judge Rush, in the case of Commonwealth v. Smith, and the objection has been pressed upon us with great earnestness and ability. Such, however, has been the uniform construction given to the act, from the time of its enactment to the present day. Very early after its passage, in 1795, the case of Mulatto Bob was tried before Chief Justice McKean, and his associate, Judge Smith, two of the three judges of the Supreme Court, and in it the court declared their sense of the true meaning of the Act of 1794, corresponding with the doctrine of Judge Rush, and with

[Kilpatrick *v*. The Commonwealth.]

that given to the jury in this case. That was a contemporaneous construction of the act, and by the highest authority. Mulatto Bob's case, 4 *Dall*. 146, was followed by Commonwealth *v*. O'Hara, 7 *Smith's Laws* 694, also tried before two justices of the Supreme Court; by Commonwealth *v*. Smith, 7 *Smith's Laws* 696; by Commonwealth *v*. Green, 1 *Ash*. 289; and by numerous other cases. In all these, there is no essential variance of doctrine. A construction so uniform, so long-continued, and which has remained untouched by the legislature, from 1795 to the present day, we are not at liberty to repudiate.

We think, also, that those portions of the charge of the court to which exception is taken in the eighth, tenth, and eleventh specifications are fully sustained by the authorities.

It is urged, in support of the ninth exception, that the court withdrew from the jury the question whether the offence charged, was murder in the second degree. We repeat, what has often been said, that the charge of the court must be considered as a whole. Thus considered, it is apparent that the jury were left free to find a verdict of murder in the second degree, if, in their opinion, such a verdict was warranted by the evidence. Nor is it at all certain that even the isolated sentence in the charge, to which exception was taken, was not entirely correct. It was not a binding direction, and could not have been so understood by the jury. The question which they subsequently addressed to the court shows that they did not so understand it. The killing of McCracken by the prisoner was admitted; the killing with a deadly weapon was admitted. There was no pretence that the wound was not designedly given. The intent to take life was presumable from the nature of the weapon used. The offence must therefore have been murder in the first degree, or manslaughter, as the jury might find that it was committed deliberately and premeditatedly, or in hot blood. A judge may rightfully express his opinion respecting the evidence, and it may sometimes be his duty to do it, yet not so as to withdraw it from the consideration and decision of the jury.

The final exception is, that the court erred in the instruction which they gave to the jury, respecting the evidence of the prisoner's good character. This, like the former, is based upon a misconception of the charge. We do not understand the purport of the instruction to have been, such as it is contended to have been by the counsel for the plaintiff in error. The substance of the charge was, that the law permitted evidence of good character to be submitted to the jury (of course for their consideration) in every case of homicide, no matter what might be the other testimony in the cause, and that when a doubt arises as to the guilt of the accused, such doubt was conclusive in his favour. This by no means confined the jury to attaching importance to the evi-

[Kilpatrick *v.* The Commonwealth.]

dence only in cases of reasonable doubt. On the contrary, it left them at liberty to make it a basis for the formation of a doubt. The charge is, therefore, not liable to the criticism which has been made upon it.

This disposes of the whole case. Guided as we must be by the law as already settled, we are constrained to say that we discover no error in this record.

The judgment is affirmed.

THOMPSON, J., dissented.