## Small *versus* The Commonwealth.

1. Under what circumstances dying declarations are admissible in evidence.

2. *It seems*, that evidence of a man's natural disposition is not admissible to excuse or mitigate his crime.

3. Keenan *v.* Commonwealth, 8 Wright 55, approved.

October 13th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Error to the Oyer and Terminer of *Allegheny county :* Of October and November Term 1879, No. 131.

Indictment of Frank Small for the murder of C. R. Jacoby.

About one o'clock on the morning of the 16th of January 1879, Jacoby was shot in the street in Pittsburgh. He was immediately removed to his house, and a physician summoned, who found him in a very critical condition. On the afternoon of Saturday, the 18th of January, the deceased was informed by one of his physicians that he could live but a few hours. In reply "he remarked he didn't feel as if he were going to die." He grew rapidly

[Small v. Commonwealth.]

worse, however, and about two hours after the above conversation, two other attending physicians informed him "that he was dying, and that it was important, in order that justice should be done to all, that he should make a dying declaration, and state all the facts exactly as they occurred in relation to his death." The mayor of the city was then sent for, who testified in regard to what occurred at the house of deceased:—

"When I went there, from the physician in attendance I understood that he was dying. I asked one physician if they had informed him of his condition. I think he said they had not. I told him he had better do it. He went to Mr. Jacoby and told him that he was rapidly sinking, and if he had any statement to make he had better make it at once. Then I said, 'If you think you are dying, and have any statement to make, I will take it. But I want to know first whether you consider yourself as dying?' He said, 'I am satisfied I am dying.' Then I took his statement."

The declaration was as follows:—

"I, C. R. Jacoby, having sent for the mayor, in view of approaching death, desire to make a statement or dying declaration. I met with Frank Small on Wednesday night or Thursday morning, at one o'clock A. M., at Keyser's saloon, on Fifth avenue, near Congress street. I went into the saloon the back way. He, Frank Small, was in there; had been cleaning snow off the pavement, and as it was rather late, concluded to go down to Keyser's, as I thought my wife was there. I went in the back way. I said something to him—don't remember what—and struck at him. My wife was in the room. He went out of the house at once. I came out of Keyser's, with my wife, at once. When I struck at Small I missed him; the blow fell short. My wife and I walked down Fifth avenue. Right opposite the foot of Chestnut street, on Fifth avenue, a man came down Chestnut street, crossed Fifth avenue rapidly, towards myself and wife. The man said something; think it was God damn you, and placed the pistol close to my side and fired, the ball entering the left side. I recognised the man as being the same one I had the trouble with in Keyser's, although I had not seen Frank Small for several years. I am perfectly sure it was Frank Small. I fell, and did not see him after he fired the pistol shot. I had recognised him as Frank Small in Keyser's. We had taken hold of each other in Keyser's, but no blows was struck. He went out the front way at Keyser's, and my wife and myself went out the back way. I saw Keyser and Keyser's son and Frank Small in Keyser's saloon; also, another young man, a tallish man with black mustache. At the time Frank Small approached me, I saw this same man that I had met at Keyser's, on the opposite or upper side of Washington street. I had seen this man before, but do not know his name. I make this statement in view of death, that full justice may be done. In speaking of last

10 Norris—20

[Small *v*. Commonwealth.]

Wednesday night or early Thursday morning—I mean the Wednesday and Thursday of the present week, when Small presented the pistol at me—I saw it, and grabbed for it, but missed it. I desire to be sworn to this statement, as it has been just read to me.

C. R. JACOBY."

" Sworn to before me, this eighteenth day of January 1879.

ROBT. LIDDELL, Mayor."

The Commonwealth proved the foregoing facts, and then offered in evidence the above declaration. Counsel for the defence objected on the ground that it contained matter immaterial and not properly the subject of a dying declaration, and that the urgency of impending death was not sufficiently proven under the circumstances.

The court, Kirkpatrick, J., overruled the objections and admitted the evidence.

The fourth point of the defendant, with the answer of the court thereto, was as follows :—

Cooling time, or that space of time which will be deemed sufficient for a man to cool, after a conflict, may differ with different persons, according to the constitution of their nature. No uniform rule can be laid down as to the length of time when a man shall have had cooling time. It is for the jury, under all the evidence, as to the actual condition of the mind of the actor.

Ans. " This point, although broader in its suggestions than in our judgment the law warrants, in this, that it introduces into ' cooling time' as an element to be considered by the jury that the prisoner, as well as all other persons standing in his place, are to be judged and considered ' according to the constitution of their nature,' still we instruct you that the ' conditions of his nature' must be found by you from the evidence in and circumstances surrounding and arising out of the case. In a word, his ' mental condition,' or, as it is nominated in the point, the ' condition of his nature,' can only be ascertained from proof."

Verdict murder in the first degree, and after sentence of death defendant took this writ and alleged that the court erred in admitting the above declaration and in the refusal of the defendant's fourth point.

*Thomas M. Marshall, E. A Montooth* and *Morton Hunter*, for plaintiff in error.

*John S. Robb*, District Attorney, *John Coyle* and *William Reardon*, for the Commonwealth.

Mr. Justice GORDON delivered the opinion of the court, January 5th 1880.

After a very careful examination of this case, both as to the law

and the evidence, we have failed to discover anything whereof the defendant has just right to complain.

That the declarations of Jacoby, the deceased, were properly admitted there is no doubt. That he was dying at the time is admitted; and that he was conscious thereof is testified to by both Doctor Ewer and Mayor Liddell; that he had said to Doctor Purviance, three hours before, that he did not feel as if he were going to die, is of no moment if he was conscious of impending death when his declarations were written down. He was sinking rapidly, and he had been previously informed, by both the physicians above named, that his condition was hopeless; it is, therefore, not only not remarkable, but altogether natural, that his opinion of his own situation should have changed within the short time above stated.

Complaint is made that the defendant's fourth point was not properly answered, or, as it is said, it was answered with such "expressions of depreciation as to destroy its value with the jury." That point reads as follows: "Cooling time, or that space of time which will be deemed sufficient for a man to cool, after a conflict, may differ with different persons according to the constitution of their nature. No uniform rule can be laid down as to the length of time when a man shall have had cooling time. It is for the jury, under all the evidence, as to the actual condition of the mind of the actor." The two last paragraphs of this point had previously been fully and fairly answered in the charge, and the remainder might well have been refused. Nevertheless the learned judge, after remarking that the point was broader in its suggestions than the legal rule warranted, in that it introduced into the question of "cooling time" the consideration of the constitution of the prisoner's nature, does answer this point in the affirmative by saying: "We instruct you that the 'conditions of his nature' must be found by you from the evidence in, and circumstances surrounding and arising out of the case. In a word his mental condition or, as it is nominated in the point, the 'condition of his nature,' can only be ascertained from proof."

Now, if this answer is obscure, it results from an attempt to answer an obscure and ambiguous point. What does the counsel mean by the use of the term according to the "constitution of their nature?" Does he mean that each individual has a disposition peculiar to himself? That whilst one man is phlegmatic and cool, never acting except with deliberate purpose, another is passionate and irascible, the creature of impulse, inflamed beyond the power of self-control by insult or injury? If this is, indeed, the meaning of the point, then it fails radically in that there is no evidence to support it. Of Small's character or disposition we are not informed; he may have been a man of perfect self-control, or he may have been quick-tempered and passionate; he may have been good-natured or ill-natured, but upon this we have no light except that

[Small *v.* Commonwealth.]

which springs from the history of the tragedy itself. Neither do we see upon what principle of law such testimony, had it been offered, would have been admissible. Here is a man who, to all appearance, is governed by the ordinary passions and dispositions of his kind; he is neither drunken nor idiotic; how then can we enter into the peculiar idiosyncracies of his mind to determine just where and how it may differ from the mind of some other man? Whether his natural disposition was such that passion would, possibly, control it a moment or two longer than that of ordinary persons? The law has no measures for distinctions so delicate. Neither should it have. Man is largely the creature of education; his character depends principally, if not wholly, upon his own will, and for that character he is legally responsible. Suppose then we admit testimony that the defendant is quick-tempered, violent and revengeful; what then? Are these an excuse for, or do they even mitigate crime? Certainly not, for they result from a want of self-discipline; a neglect of self-culture that is inexcusable. Unless, therefore, we can reach back into the original constitution of man's nature, and ascertain just where evil propensities are permanent and ineradicable in that nature, all our attempted investigations amount to nothing, since ordinarily, a bad character, or a bad disposition, is acquired, not natural. We must, therefore, treat the proposition that a man's evil propensities shall be used to excuse or mitigate his crimes as false, and as inadmissible as a defence. As was well said by Mr. Justice LOWRIE, in the case of Keenan *v.* Commonwealth, 8 Wright 55, "Stated in its most general form, it amounts to this: that because the mind usually receives provocation with an intensity proportioned to its own excitement or excitability, therefore the act of provocation must be measured, not by its own character and ordinary effect, but by the state and habit of the mind that receives it. Then, measured by this rule, the crime of a proud, or captious, or selfish or habitually ill-natured man, or one who eats or fasts too much, or of one who is habitually quarrelsome, covetous, dishonest or thievish, or who by any sort of indulgence, fault or vice renders himself very easily excitable, or very subject to temptation, are much less criminal than those of a moderate, well-tempered and orderly citizen, because to the former a very small provocation or temptation becomes adequate to excuse or palliate any crime." It will easily be seen that the adoption of such a rule would result in the encouragement of vicious habits, for it would make evil the palliative of crime, and vice would become an excuse for its own fruits. As yet, in Pennsylvania, a theory so fraught with injury to the community, finds no place in its criminal jurisprudence, and it is to be hoped it never will.

"All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, * * * shall be deemed murder in the first

degree. Such is the language of our criminal code, and that the crime of the defendant comes literally within it there is no doubt. His tussle in Keyser's saloon with Jacoby was not, in itself, provocation sufficient to excuse even an assault and battery. There was no blow struck, he received no injury however slight. He manifested no unusual excitement; he was in full possession of all his faculties, for it does not even appear that he had been drinking; as he passed out of the saloon he apologised to Keyser for the affray, and in three or four minutes after this time he discovers Jacoby and his wife quietly passing along the street; he crosses that street, confronts his victim, and without a word or act of an irritating or insulting character from that victim, he shoots him down, and the next we hear of him is at Wallace's, on Penn avenue, about one-half or three-quarters of an hour after the commission of this diabolical crime, buying cigars, with all the coolness and unconcern of a man who had performed the most ordinary act of business or pleasure.

Under such circumstances it is indeed difficult to talk seriously about cooling time, or to apply the technical rulings of a doctrine of this kind in a case where there is no room for their application.

The whole method and manner of this killing shows premeditated and deliberate malice. Had the defendant a pistol in his possession when the scuffle occurred in the saloon? If so, one of two conclusions result; that he did not consider its use necessary at that time, as a means of self-defence or to avenge the insult, and that the design to kill was formed afterwards; or that the purpose of killing was then formed and deferred to a more fitting opportunity. If, on the other hand, he subsequently procured the pistol, it would, in that event, seem certain that he did so with the preconceived design of waylaying and killing his adversary. In either event there is the most indubitable evidence of a wilful, deliberate and premeditated intent to murder. We think, then, that this case has been well and fairly tried, and if there has been any mistake it has been of a character so purely technical as to have occasioned no injury to the defendant.

The judgment is affirmed.