## Fullam, Executor of Otis, *v.* Rose, Appellant.

*Evidence—Payment—Married women.*

A married woman executed a paper by which she acknowledged that she had in her possession one thousand dollars belonging to her brother, " he having deposited the same with me for safe-keeping, which moneys are payable to him, or his heirs or assigns, on demand at any time." In a suit against her by her brother's executor, defendant offered evidence tending to prove that she had returned to her brother the one thousand dollars referred to; that she then asked for the papers she had given him, and he replied it made no difference between them, that he had torn them up, or would tear them up; that defendant's husband then drew a receipt which was signed, and alleged to have been afterwards lost, but that it was seen by one or two of the witnesses. *Held*, that the testimony if believed was sufficient to warrant and sustain a verdict in favor of defendant.

In the above case the inventory and appraisement filed by plaintiff as executor was admissible for the purpose of showing that the claim in suit was omitted therefrom.

A certified copy of the adjudication of plaintiff's account as executor was also admissible for the purpose of showing that defendant was a creditor of the estate, and a distributee under the adjudication, and that no claim had been made against her, in any form, on the paper in suit.

*Married women—Plea of coverture.*

A married woman who accepts money for safe-keeping, and refuses to return it when demanded, cannot take refuge behind the plea of coverture.

*Charge of court—Province of jury—Credibility of witness.*

It is the province of the jury to reconcile if possible apparent inconsistencies and contradictions in the testimony of witnesses, and where there are such inconsistencies and contradictions, it is improper for the court to suggest that the case turns solely on the veracity of a particular witness.

Argued Jan. 25, 1894.  Appeal, No. 159, Jan. T., 1894, by defendant, Anna Maria Rose, from judgment of C. P. No. 3, Phila. Co., March T., 1892, No. 810, on verdict for plaintiff, Richard Fullam, executor of Luke Otis, deceased.  Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.  Reversed.

Assumpsit for money deposited with defendant by plaintiff's testator.

At the trial, before GORDON, J., the court, under objection and exception, refused to admit in evidence, as offered by defendant, a certified copy of the inventory of the estate of Luke Otis, deceased, the claim in suit being omitted therefrom. [4]

The court also refused, under objection and exception, to admit in evidence, as offered by defendant, a certified copy of the adjudication of the account of William Fullam, as executor of the estate of Luke Otis, deceased, made, as stated, for the purpose of showing that defendant was a creditor of the estate and a distributee under the said adjudication, and that no claim or set-off was made against her in the orphans' court on the paper on which suit is here brought. [5]

The court charged in part as follows:

" [The defence rests mainly upon the testimony of this boy, who was fourteen years of age at the time of the occurrence with relation to which he has testified. I say that it rests mainly upon his testimony, and I shall show you in a little while why that is so. He and what he testified to constitute the luminous point in this case, from which all rays go, towards which they all tend. It is impossible to discard his testimony and find a verdict for this defendant upon the other testimony alone, because the testimony of Mr. Hyland, Mrs. Dauvry and Mr. Busch is indissolubly connected with the occurrences, which, the boy Dauvry says, took place in Mrs. Rose's tavern on that day.] [7]   Now, he says that he wrote a postal card to Luke Otis to come down on important business to Mrs. Rose's saloon, and that he did come there on the 10th of January, and that she said to him that she wanted to pay him the money which she owed him, and that it had troubled her, and that she did not want to keep it any longer. McCambridge, he says, was present, and Michael Rose, husband to Mrs. Rose, he says, was also present. According to his story, Luke Otis did not want the money, but wanted her to retain it, and said that he wished it was $2,000 instead of $1,000, and that she was as good as gold, but he says that she insisted upon the payment of the money, and he had to take it ultimately, and that when she asked him for the paper, which she had given him acknowledging the receipt of the money, that he said, 'I have not got it; I tore it up; it was of no consequence.'

"I said to you in my opening that your verdict one way or the other made either the dead man dishonest or this defendant dishonest, and it is upon that item of testimony that I make that observation. Because, if this money was paid then, and paid on account of this paper, Luke Otis told a deliberate falsehood, and deceived his sister. But the witness Dauvry says the money was paid, and that when the dead man said he did not have the paper, that he had torn it up, that then Michael Rose, the husband of this defendant, got pen and ink from behind the counter, and drew a receipt which Luke Otis signed. He says that she also insisted upon him taking twenty-five dollars as interest, and that she forced it upon him by putting it in his pocket. By the testimony of Busch, when testifying as to what occurred upon that day, as they were coming from this very scene which Dauvry described, Mrs. Rose and a man named McCambridge, who is said to have witnessed the receipt, and the dead man, all went to Busch's tavern, and he says that there the dead man said that the old woman or Mrs. Rose had paid him all she owed him, and we came down to take a drink, and that there they had one or two drinks, and that Otis said he was going to deposit this money in bank, but would first stop at Hyland's, and that he left there alone, as I understood him to go to Hyland's, and thence to the bank. Then, Mr. Hyland was called, who said that Mr. Rose and Mr. Otis came into his place, but the time he could not fix, as to whether it was in 1886 or 1887, or earlier or later than any of those dates, he did not know. He declined to approximate even within a year or two, as to when it was, but he says that at the same time Mr. Rose and the dead man came into his place, and that Otis said that Mrs. Rose had paid him some money that she had borrowed from him to build a house at Sea Isle City, and that he exibited the money and said he was going to bank to deposit it. Mr. Hyland also said that he thought he wrote the deposit slip for this $1,000, but the deposit slip actually put in bank that day by Otis is in evidence, and Mr. Hyland says that the writing is not his. From there Mr. Otis seems to have gone to the bank and deposited the money.

"Mrs. Dauvry was also introduced and said that upon this day, the tenth of January, she saw Luke Otis alone, standing outside of Mrs. Rose's tavern, and that he told her that Mrs.

Rose had paid him the money she owed him, and touched his pocket, and said that he had it there.

"Now, gentlemen of the jury, as I have said, everything hinges upon the truth of Dauvry's statement. If Hyland's testimony stood alone, to wit, that upon the day, which he could not fix, Mr. Otis came and said that Mrs. Rose paid him all she owed him, $1,000, and if it was proven that it was deposited, that would not prove the payment of this $1,000. So, too, if Busch's testimony simply was that Otis came in and said, 'Mrs. Rose had paid me the thousand dollars she borrowed of me to build the house in Sea Isle City,' and that was all the testimony, that would not prove the payment of the $1,000 deposited by him with her for safe-keeping, supported by the production of this paper. But all of them bring the parties to their place and fix the conversation as to the payment as to which the boy Dauvry has testified; and Dauvry says it was the payment expressly of this $1,000, when she demanded the return of the paper, and when he said, 'I have not got it, I tore it up.' Gentlemen of the jury, this, taking the testimony as I have stated it, if true, presents Otis as a man who had deposited with his sister $1,000 which he wanted her to keep, and did not want to receive, and yet the man who had that confidence and trust in his sister takes the money from her and lies about the possession of the paper, and tells her that he has destroyed it. On Dauvry's testimony it would not do to say that his retention of the paper was a mistake, because Dauvry coupled his evidence as to that with her express demand for the paper and Otis's declaration that he had destroyed it, though it seems to have been in his possession for more than four years afterwards. So the man who, by Dauvry's testimony, received $1,000 upon the false declaration that he had destroyed Mrs. Rose's evidence of indebtedness, goes out of the place, and to a woman whom he meets on the street, and to Busch and to Hyland, and voluntarily makes statements which convict him of falsehood. In other words, the man who wanted to deceive by obtaining the money and saying that he had destroyed the paper goes out of the place and tells the world that he received the money. Those facts are all in this testimony as presented by the defendant.

"Let me also call your attention to this fact: Busch says that upon this occasion Mrs. Rose and McCambridge came into his

tavern with Mr. Otis, that drinks were had, and the declaration made that the money was paid, but he says that the statement which was made was that it was the money which Otis had loaned Mrs. Rose to build the Sea Isle City house, and which she had borrowed from him for that purpose. It appears by the evidence in the case that they had had many transactions in which money had passed between them, there had been loans before and after this, and he fixes the statement made by Otis as relating to borrowed money, loaned for this specific purpose. But the paper in this case declares that the thousand dollars was deposited for safe-keeping, and that it was demandable at any moment. And so, also, while Busch's testimony is that Mrs. Rose and McCambridge came with Otis at that time, the testimony of Hyland is that, upon the occasion to which he refers, Mr. Rose came alone, and that McCambridge or Mrs. Rose was not with him. And so, also, the testimony of Mrs. Dauvry is that, when she saw him standing outside Mrs. Rose's tavern, he was there alone. It appears, moreover, that both of these parties were depositors in this bank. It may immediately arise, it occurred to me, and it may to you, to ask why, as Otis had a bank for the safe-keeping of his money, he did not deposit it there instead of with Mrs. Rose for safe-keeping. It is probably impossible to understand it. I see no explanation of it, but it occurs in the case, and is worth mentioning. It is argued to you also that Mrs. Rose, whose visible means of support seemed to have been a drinking place alone, was maintaining and had an account at the Southwark National Bank, and that, if she had paid him the $1,000, she would not have been likely to have kept that much money about her establishment, but that she would have been more likely to have drawn it from the bank, and that as it was within her power to produce her account at the bank, and as she has not shown you that at about that time she drew $1,000 from it, you are to take that fact into consideration in determining the credibility of the witnesses. It is also argued to you that she would have given a check upon the bank, rather than the money. But what force there is in that is entirely for you.

" Mr. Otis died in January, 1890. According to the testimony he was paid this money in January, 1887. He therefore kept this paper, which the defendant says he had declared he

had destroyed, over three years afterwards, and it is now produced among his assets. Death has silenced two of the parties to this transaction. Otis cannot testify, and McCambridge, who it is alleged was present and saw the payment of the money and the making of the receipt, is likewise dead, and the law has closed the mouth of Mrs. Rose and her husband, and [hence this whole transaction, the integrity of this defence, hinges upon the reliability of the witness, the boy Dauvry]." [8]

Defendant's points were, among others, as follows :

" 1. That as the obligation in writing, bearing date the 23d day of June, 1886, offered in evidence by the plaintiff, recites that the defendant, Maria Rose, was, at the date of the execution thereof, the wife of Michael Rose, the claim here is made upon an instrument or obligation in writing, made by a married woman, such writing or obligation when so made not being binding upon married women, the verdict must be for the defendant." Refused. [1]

" 2. If the jury believe that the writing or obligation on which suit is brought is a promise to pay $1,000, on the part and under the hand and seal of a married woman, such promise is not binding upon her, and the verdict must be for the defendant." Refused. [2]

5. Request for binding instruction. Refused. [3]

Verdict and judgment for plaintiff for $1,050.

*Errors assigned* were (1, 2, 3, 7, 8) instructions ; (6) waived ; (4, 5) rulings on evidence ; quoting instructions, and bills of exceptions, but not evidence.

*S. Davis Page, John C. Gallen* with him, for appellant, cited : Jones, Bailment, 36, 102, 117 ; Story, Bailment, 850 ; 5 A. & E. Ency. L. 572 ; 14 Ib. 605, 649 ; Addison on Contracts, 2d Am. ed. 696 ; Porter v. Pflaum, 11 W. N. 252 ; Quinn's Ap., 86 Pa. 452 ; Sixbie v. Bowen, 91 Pa. 149 ; Bruner's Ap., 47 Pa. 67 ; Steinman v. Ewing, 43 Pa. 67 ; Pettit v. Fretz's Ex'rs, 33 Pa. 120 ; Glyde v. Keister, 32 Pa. 85 ; Act of April 11, 1848, § 6, P. L. 536 ; Schouler on Domestic Relations, 3d ed. § 58 ; Vandyke v. Wells, 103 Pa. 49 ; Keiper v. Helfricker, 42 Pa. 325 ; Mahon v. Gormley, 24 Pa. 82 ; Caldwell v. Walters, 18 Pa. 79 ; Bear v. Bear, 13 Pa. 529 ; Lancaster v. Dolan, 1 Rawle, 231 ;

Real Est. Co. v. Roop, 132 Pa. 496 ; Act of June 3, 1887, P. L. 332 ; Kelly v. Eby, 141 Pa. 183 ; Borland v. Stokes, 120 Pa. 278 ; Keen v. Hartman, 48 Pa. 497 ; Wilt v. Welsh, 6 Watts, 9 ; Penrose v. Curren, 3 Rawle, 353.

*James E. Gorman*, for appellee, cited : Sewing Machine Co. v. Heil, 115 Pa. 487 ; Franklin's Admr's Ap., 115 Pa. 534 ; Reese v. Bank, 31 Pa. 78.

OPINION BY MR. CHIEF JUSTICE STERRETT, Feb. 26, 1894 :

This action, brought by the executor of Luke Otis, is on a sealed instrument, executed by the defendant June 23, 1886, of which the following is a copy : " Know all men by these presents that I, Anna Maria Rose, wife of Michael Rose, do hereby acknowledge that I have in my hands the sum of one thousand dollars belonging to my brother Luke Otis, he having deposited the same with me for safe keeping, which moneys are payable to him or his heirs or assigns on demand at any time."

In his statement, plaintiff avers that on said date defendant received from her brother $1,000, and thereupon executed said acknowledgment, which was " in the possession of said Luke Otis at the time of his death and now in the possession of plaintiff ; " that as executor of said Otis he demanded payment of said sum, which was refused. The pleas were non assumpsit, payment with leave and coverture, on all of which issue was joined.

On the trial plaintiff gave in evidence the paper in suit, his letters of administration, etc., and rested. To maintain the issue on her part, the defendant introduced testimony tending to prove that on January 10, 1887, she sent for her brother and returned to him the $1,000 referred to, and, in addition thereto, gave him $25.00, which he at first refused to take ; that she then asked for the paper she had given him, and he replied it made no difference between them ; that he had torn it up or would tear it up ; that defendant's husband then drew a receipt which was signed, and alleged to have been afterwards lost. It was not produced at the trial, but there was some testimony tending to show that shortly after it had been given it was seen by one or two of the witnesses. It is unnecessary to refer specially to the testimony tending to prove payment of the $1,000 in con-

troversy, and circumstances connected therewith, or to other
facts and circumstances, testified to by defendant's witnesses,
tending to corroborate the direct evidence of payment. It is
sufficient to say that the testimony, if believed by the jury, was
quite sufficient to warrant a verdict in favor of defendant.

For the purpose of further corroboration, defendant offered
in evidence the inventory and appraisement filed by plaintiff as
executor of Luke Otis for the purpose of showing that the
claim in suit was omitted therefrom. Also, a certified copy of
the adjudication of plaintiff's account as said executor, for the
purpose of showing that defendant was a creditor of the estate
and a distributee under said adjudication, and that no claim
was made against her, in any form, on the paper in suit. These
offers were both objected to by plaintiff and excluded by the court.
This we think was clear error. The omission of the claim in suit
from the inventory was a circumstance, the benefit of which
the defendant was entitled to. If unexplained, it might, in
connection with other testimony, have an important bearing on
the question at issue. The adjudication of plaintiff's account
and the facts connected therewith appear to be quite pertinent
to the defence. The former would have shown that a claim,
founded on a judgment note signed by plaintiff's testator, dated
July 10, 1890, for $1,500, payable one year after date, with in-
terest from July 10, 1889, amounting in all to $1,665, was
then presented by defendant and awarded to her out of the
fund for distribution. It will be observed that this note is
dated over three years after defendant alleges she paid to her
brother the money claimed in this suit. If the latter was never
paid, as plaintiff contends, and defendant was still indebted to
her brother in 1890, it is difficult to understand why he should
give her the judgment note for $1,500; and if the claim in suit
was still outstanding at the time of the adjudication it is still
more singular that plaintiff did not present it against her. It
is no justification of the ruling complained of to say that these
and other matters were susceptible of easy explanation. The
proposed evidence should have been received, and then ex-
planation, if any were needed and could be given, would have
been in order. The fourth and fifth specifications are sustained.
There is no merit in the first three specifications. A married
woman who accepts money for safe-keeping, and refuses to re-

turn it when demanded, cannot take refuge behind the plea of coverture.

We also think the defendant's case was unduly prejudiced by the manner in which it was submitted to the jury. It was not necessary to suggest that her defence depended solely on the veracity of her principal witness. Apparent inconsistencies and even contradictions in the testimony of witnesses do not necessarily imply willful falsehood. As a general rule it is the safer and better course to instruct the jury that it is their duty to reconcile such discrepancies and contradictions, if it can be fairly and satisfactorily done,—as it can in a great majority of cases. Failing in that, it is their duty, from all the light before them, to determine whether the witness should be believed by them or not. In other words, it is the province of the jury to pass upon the credibility of witnesses who testify before them.

Judgment reversed and a venire facias de novo awarded.