497, (1900).]                            Syllabus.


# Commonwealth of Pennsylvania v. Emily Winkelman, Appellant.

*Charge of court—Permissible judicial comment.*

It is often permissible and sometimes advisable for a judge in his charge to the jury to express an opinion upon the facts provided he does it fairly and does not give a binding direction or interfere with the province of the jury. Such comment is particularly unobjectionable where it simply leads the minds of the jurors up to the substantial matter of controversy, but without binding them to accept the judge's views as to the matters of fact concerning which there is no real conflict of evidence.

*Credibility of witnesses—Dying declarations.*

It is the province of the jury to pass upon the credibility of witnesses who testify before them, and this rule applies to dying declarations, more especially when apparent discrepancies may have resulted from difference of recollection of the persons who heard them, and whereas to the main fact the statements are consistent.

*Absence of request for instructions—Requirements as to charge.*

The most that can be required of a judge in the absence of request for particular instructions is that he state the parties' contention as to the facts established by the testimony and its effect, and leave the question to the jury.

*Dying declarations—Primary requisites as to admission—Burden of proof.*

Dying declarations are only admissible when made by a person who is under the influence of an impression that his dissolution is impending. This is a preliminary fact to be proved by the party offering them in evidence, and the proof offered for this preliminary purpose is addressed in the first instance to the conscience of the court. It need not be proved that the declarant stated in so many words that his statement was made under a sense of impending death. It is enough if it appears satisfactorily in any legitimate mode that it was made under that sanction. The belief of a sudden dissolution is the test by which the competency of dying declarations is to be measured.

*Charge of court—Allegations of one-sidedness will be reviewed on general effect.*

When, in such a case, the complaint is, that the charge was inadequate or one-sided, and the particular error of law or material misstatement of the evidence cannot be pointed out, the court will be reviewed on the general effect of the charge, and not upon sentences or paragraphs disconnected from the context which qualifies and explains them; if, as a whole, the charge was calculated to mislead there is error in the record; if not there is none.

The Act of June 26, 1895, P. L. 387, making dying declarations competent evidence in prosecutions for criminal abortions, etc., where the subject shall die in consequence of such unlawful act is constitutional; it does not offend against section 7, article 3, of the constitution which prohibits the passage of any "local or special law" changing the rules of evidence in any judicial proceeding or inquiry before courts, nor does it conflict with the constitutional right of the accused to meet the witnesses face to face.

Argued Dec. 6, 1899.   Appeal, No. 130, Oct. T., 1899, by defendant, from sentence of Q. S. Northampton Co., Feb. Sess., 1899, No. 37, on verdict of guilty.   Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER, W. D. PORTER and BEEBER, JJ. Affirmed.   Opinion by RICE, P. J.

Indictment for abortion.   Before SCOTT, J.

At the trial the commonwealth made an offer of evidence, which offer and ruling thereon was as follows:

[Commonwealth proposes to prove the ante-mortem declarations of Jennie Hunter made to the witness upon the stand as dying declarations made within the last week of her life and after a declaration made by the deceased that she knew she was going to die from that sickness.

Objected to, because dying declarations are not admissible in this case, which is an indictment for abortion causing death, and that the evidence already detailed by the witness upon the stand is to the effect that any statements made to him were made several days after she had stated to him that she did not expect to get well, and that the statement that she did not expect to get well was not repeated after that, nor in connection with any statements made as ante-mortem statements, and that her mental condition, according to the testimony of the witness, was impaired, and that her answers were "yes" and "no" to questions that he had put to her which were leading, and second, that the act of 1895 is unconstitutional and void, as it does not bring the witness face to face with the defendant, and further unconstitutional as special legislation embracing only the crime of abortion and not having reference to all crimes in general, or the declarations of all persons dying with respect to both civil and criminal matters, and that the indictment does not charge any cause of injury under the act of 1895, which

would make the dying declarations even if the statute was constitutional competent evidence, and the offer of proof does not attempt to establish the causes of the injury as required by the act of 1895, and as incompetent and irrelevant.

The Court: This evidence would be admissible as dying declarations in a case of homicide: 1 Greenl. Ev. sec. 158; Wh. Cr. Ev. secs. 281, 286; Kilpatrick v. Com., 31 Pa. 198, 215. Whether the extension of such proof to cases of abortion under the act of 1895, is constitutional legislation is doubtful, but to be in doubt requires that it be upheld. This rule prevails whether the proceeding be civil or criminal, for it involves the integrity of the law, not its construction, and the co-ordinate branches of the government have already determined it. The proper forum for the ultimate decision of the matter is the appellate court, where it could not be heard, if the judgment of the inferior tribunals was against its validity, although if clearly unconstitutional this view could have no weight.

This particular offense, eo nomine, first found place in the penal code of 1860, although before that time it was held to be a misdemeanor at common law to produce an abortion when the woman was not quick with child: Mills v. Com., 13 Pa. 627. But when she was quick with child, as under the section upon which this indictment is framed, it was prosecuted as homicide in one of its grades, for the death of either mother or child. Now the constitutional provision that the accused shall be entitled to be confronted with the witnesses against him is not contravened by the admission of the dying declarations of the person slain in prosecutions for homicide : Wharton's Criminal Evidence, sec. 277; Byers v. Com., 42 Pa. 89. Why should it then be so, when the crime being the same, is but given a new and statutory name eliminating death as the subject of the charge (Railing v. Com.), with a lighter penalty, and coupled with a provision which probably did not before exist in favor of the accused, that conviction could not be supported upon such declarations unless corroborated? Rhines v. Clark, 51 Pa. 96.

The objection that this statute is a special or local law changing the rules of evidence in a judicial proceeding presents a question that could not have arisen before the constitution of 1874, and is not without force, as it must be conceded that it does change the rule of evidence: Railing v. Com., 110 Pa. 100.

But is it " special or local law " within, contemplation of the constitutional prohibition? A public prosecution concerns the whole community, and classification permits sometimes legislation which may be general in a legal sense, although limited in its operation. By reason of the fact that the common-law rule relating to dying declarations could not be extended to any other offenses, except homicide, and such as were homicide but now by statute designated as of lower grade, it is not clear that in this respect the statute violates the constitutional requirement.

For these reasons the objection to the admission of these declarations is overruled. Defendant excepts. Bill sealed.] [10]

The facts sufficiently appear from the charge of the court, inter alia, as follows :

The offense prescribed is causing abortion upon the person of Jennie Hunter, she being then and there pregnant and quick with child, in consequence of which act her death resulted. [I suppose we may take it for granted that if you accept the testimony of the physicians who made the post-mortem examination—I see no reason why that should not be accepted, but it is a matter entirely for you to say—that there was an abortion committed by some person upon Jennie Hunter which was the real cause of her death. I know of no evidence that has been presented in this case that would justify the contrary conclusion, but you may perhaps be of a different opinion.] [1] It seems to me also that it is not the subject of dispute that at the time such abortion was produced, whether by Jennie Hunter herself or by the defendant, she was pregnant and quick with child in the sense contemplated by this statute, if you believe the fact that she had conceived already at a period of time reaching back for a period tending towards four months: Com. v. Reed, Leg. Gaz. 199.

If you determine that an abortion was committed by somebody, and that this was the cause of death, it then becomes necessary to determine by whose agency that result was accomplished. The most direct testimony submitted on the part of the commonwealth in this case relating to that question is that of the declarations of Jennie Hunter herself made upon two occasions before her death, once to Dr. Fraunfelter, and once to her father. These declarations, you will have perceived, are

those of a witness who was not under oath.   They are not within the ordinary class of testimony which you hear by the mouths of living witnesses produced in court and sworn in your presence.   This is hearsay testimony; by the law of this state they are admissible in such cases as this, but before such statement shall be submitted to the jury as evidence the commonwealth must, by competent and satisfactory evidence, prove that such woman was of sound mind at the time such ante-mortem statements were made; and then no conviction shall be had upon the uncorroborated declaration of such woman.   This kind of declarations occupies a peculiar position in the administration of justice where they are admitted from necessity; they must be what are technically called " dying declarations " made by the person under the belief that she is about to die, and that dissolution is imminent and pending; if such be the case, and she be of sound mind, the law assumes that at that period when all earthly concerns are fading away the solemn responsibilities about to confront the declarant are sufficient sanction to take the place of an oath.   And yet in the consideration of that it is not to be forgotten that persons even approaching death are still animated by the motives and the purposes and the hopes that prevail while life was in fuller strength.   Therefore, it is necessary that I should say to you that you must consider these declarations carefully, the circumstances under which they were made, and whether made when Jennie Hunter had a sound mind so as to be conscious of the situation in which she was then placed.

[It has been determined as a preliminary matter by the court that these declarations are to be received in evidence, and that she was, prima facie, of sound mind in the sense that is contemplated by this statute, so as to make them admissible even though she may not have been in a condition entirely normal, as no person could ever be so while life was vanishing in consequence of this character of inflicted wound.   But before they can receive consideration at all at your hands you must be satisfied that she knew the extreme peril of her situation, and believed death to be certain and dissolution near, that she was conscious of her surroundings, that she answered the questions responsively and intelligently with knowledge of their effect and recollection of the events.] [9]

The law erects another safeguard for the protection of a defendant. It provides that no conviction shall be upon such declarations unless they be corroborated; and so I say to you in this case that if you accept the competency of these declarations by Jennie Hunter, before you can convict the defendant you must be satisfied that you can find in the other evidence corroboration of the statements which she made. There must be corroboration in some material part of these declarations; it need not extend to the whole of her statement, because if you find it corroborated in certain material particulars by testimony which you are satisfied to accept you have the right to infer that her statement is true in other respects. It is necessary that you should specially understand also what this corroboration means when I say it must be in some material part. You must find corroboration of these dying declarations both with respect to the commission of the crime and with respect to the person who committed it, because even if corroborated as to the actual commission of the crime we are still not arriving at the point where we can say who was the guilty agent, unless that matter be also corroborated.

There is the testimony of other witnesses in this cause on the part of the commonwealth: two of them are William Hunter and Oscar Kemmerer. If it be true that they went with Jennie Hunter and Bertha Fair to the house of this defendant for the purpose of having an abortion committed, then they were voluntary coworkers to accomplish that result, and Oscar Kemmerer and William Hunter would be what the law describes as accomplices in the commission of the crime. The law puts Jennie Hunter into the category of an accomplice by requiring that her dying declarations shall be corroborated, and if these two persons went to this place with her in the purpose to have an abortion committed, as contended by the commonwealth, then they would also be accomplices, and they would need corroboration themselves: one accomplice cannot corroborate another however many the number of accomplices who testify in a cause—there must be some independent corroboration of their statement to the extent I have indicated respecting Jennie Hunter. It is the theory of the defendant that they were not there for the purpose of having an abortion produced, but for the purpose only of having Jennie Hunter remain while she

was in confinement. I have said that there must be corroboration of these dying declarations with respect both to the commission of an offense and as to the person who committed it. Do you believe that an abortion was committed at all, whether by Jennie Hunter herself, or by the defendant? [Do you accept the testimony of these physicians who made the postmortem, that the conditions of this womb as then taken and now presented with the visible marks of injury upon it indicate that an abortion had been committed upon her, and that in consequence of that injury Jennie Hunter died? If you find that to be the fact, then it seems to me that we need not stop to inquire whether there is further corroboration of her dying declarations with respect to the commission of the crime of abortion; but this is a matter for you, and you are not bound by my opinion.] [2] If you accept this conclusion it is more important to inquire whether there is corroborating evidence of the dying declarations of Jennie Hunter of the fact that this defendant committed the offense. [Do you find anything in the testimony of the physicians, or otherwise, that if the injury had been inflicted upon herself for any appreciable period of time before she went to this house in Easton by a pencil, or a needle, she would not have been in that physical condition which is described by her father, if you believe him, when she left on Sunday night? Would it be possible if she had inflicted an injury, the consequences of which were serious enough to cause the abortion, for the length of time previous that appears in this testimony, she would have been in such condition as is described by her father when she left? You have the testimony then also of the physicians who were called upon the part of the commonwealth with reference to the pain suffered after she left the defendant's house on Wednesday night in the morning following her arrival at her home. Do you find in that testimony and these circumstances, if you so remember them, any corroboration of the fact asserted by her that if an abortion was produced it was at sometime between the period on Sunday night when she left home and on Wednesday night when she returned?] [5] It does not seem to me her statement that she went to a certain house in Easton, which she describes, and to a certain woman, whom she also describes but does not name, requires further proof, because the defendant upon the stand

herself says that it was to her house that Jennie Hunter came, and that she remained there from Sunday night until Wednesday night when she was removed. Do you find in those circumstances, if you believe them to be proven, anything to corroborate the dying declarations of Jennie Hunter that she went to the house of Mrs. Winkelman and there parted with the child in her womb? It is necessary, I have said, to find this corroboration before any of her testimony is considered.

There is evidence submitted upon the part of the defendant intended to convince you that this abortion was produced by Jennie Hunter herself, and they ask you to consider her declarations made to these witnesses whom they have called upon the stand, or those for the commonwealth whom they cross-examined, that she used both a pencil and long needle for the purpose of effecting it; used them until she bled, and in that condition came to the home of the defendant. If Jennie Hunter herself produced the abortion the defendant cannot be convicted, but if her effort was unsuccessful and it was finally consummated by this defendant, it would be no excuse for her to show that Jennie Hunter also undertook it; upon that branch of the case you would be required to consider the conditions testified to by the witnesses with reference to the use of the pencil and needle and say whether she had failed. There may be corroboration in circumstances as well as in direct testimony. If Jennie Hunter had succeeded in accomplishing the abortion herself what would have been her purpose to go then to Easton to Mrs. Winkelman? The condition that was confronting her and of which she was in apprehension would then have been removed. If successful would prostration have followed earlier or not? [As I remember the testimony of Bertha Fair, a witness called by the defendant, although you may remember it differently and it is for you to say, she testified that two days before they came down to Easton, Jennie Hunter had declared to her that while she had used the pencil and the needle for the purpose of effecting that result it had been unsuccessful.] [3] If it had been unsuccessful then, and it was otherwise after she came to Easton and remained at the defendant's house, as is admitted from Sunday night till Wednesday night, the commonwealth asks you to say that there could have been but one place where that abortion did take place, as she never left the defendant's house until she went home.

[The commonwealth points to another circumstance which they say is corroborative of these dying declarations of Jennie Hunter, in the testimony of the defendant herself when she says that it was arranged that Jennie Hunter should come to her house for the purpose of being confined in the usual way. Jennie Hunter was seventeen years of age, and if you accept the testimony, as I recall it, this fœtus was from two to four months only from conception. Was it probable that, if that was her condition at this age, a person of the experience of this defendant in midwifery when she observed Jennie Hunter would be deceived in her appearance, and believe on Sunday night when she came that she was upon the point of confinement? Is it probable that such an arrangement as that had been made when Jennie Hunter was but four months gone? There must be the kind of corroboration I have defined, and the commonwealth claims that these circumstances are corroborative of the fact asserted that the defendant was the actual wrongdoer, together with the additional fact alleged that this defendant, when she knew there was a warrant for her, fled from the jurisdiction and was brought back upon a requisition from another state. Whether they do have that weight or not is for you to say.] [8]

Flight from prosecution for crime is a circumstance that may be considered with all other evidence upon the question of the guilt of a party and the identity of a person accused; but whatever weight it may seem to have is for you to say upon that question in connection with any explanation given. The defendant introduces proof to which your attention has been called intended to show that her departure was quite in the ordinary course, and that it had been her purpose for some time before. Now, you will say whether you find any corroborating circumstances to the truth of the declarations of Jennie Hunter with respect to the commission of this crime of abortion by the defendant. If you fail to find that corroboration, then the statute says the defendant is entitled to be acquitted. If you find there is corroboration, then you must inquire into the declarations themselves, examine them in the same way that you would consider the testimony of a witness if produced in court upon this stand, and determine its credibility altogether.

It is alleged by the defendant that they have shown the two statements of Jennie Hunter were inconsistent with each other—I mean the declarations made upon these two occasions which were close together, first to Dr. Fraunfelter and then to her father. In considering the testimony of a witness produced in court your attention is frequently called to contradictory statements made, and in so far as the contention may seem to be supported when your attention is called to them by just that much it affects the credit of all of the evidence of that particular witness. [Is it the fact that there were any inconsistent or contradictory statements made by Jennie Hunter to Dr. Fraunfelter, or to her father, and afterwards to Dr. Fraunfelter? Your attention has been directed to what is claimed to be so, and certainly more is contained in the declarations to the former than to the doctor. Of course, you will understand that a witness in detailing a history of a transaction upon two different occasions may not describe it exactly alike in both instances; it would be impossible to do that, perhaps, unless the history of it has been committed to memory; the fact that statements are not alike may, or may not, according to whether omissions or additions may be of material matter, be evidence of their falsity.] [6]

[The defendant calls your attention to the fact that there were statements made in her dying declarations that they have proven must have been false and untrue. Your attention has been directed to the circumstance that in her declaration to her father she said that two instruments were used by the defendant upon her upon Sunday night, and that one of them remained in her person until Monday morning. The defendant has produced testimony of the physicians intended to satisfy you that a condition of things like that would be impossible, and the commonwealth, upon the other hand, in the cross-examination of those witnesses endeavor to show that some instrument if provided with certain appliances might be so used; that is only one of the circumstances which I have used for illustration appearing in the medical testimony to which the defendant directs your attention, and has elaborately discussed as showing that the statement of Jennie Hunter with respect to what took place at that house could not have been true. You will thus see the importance of considering the question of the credibility of these dying declarations, because they are, as I have said,

the most direct in this case submitted upon the part of the commonwealth bearing upon the guilt of the defendant.] [7]

The defendant also refers to the fact and has submitted testimony upon the part of the physicians intended to prove that the operation which Jennie Hunter described as being performed upon herself resulted in the death of the child, foetus, before she went to Mrs. Winkelman's house, and if that were true, and if, as Mrs. Winkelman said, the womb was empty when she made the examination, of course, it would make no difference what the purpose of these people were, or what they attempted to do; if the womb was then empty, or the foetus dead, Jennie Hunter would not have been quick with child when she went to that house, and the defendant could not be convicted.

It is necessary that the commonwealth establish the guilt of the defendant beyond a reasonable doubt upon the consideration of the whole of this testimony. The defendant on her part, among other witnesses, produces herself and her daughter as to the circumstances immediately attending the introduction of Jennie Hunter into that house, and you have heard what she has described as the operations performed importing no crime. The defendant is a competent witness; you have a right, however, to consider the interest which she has in the result of a prosecution. Her daughter has no direct interest in your conclusion, but you have the right also to consider her relationship, and whether that might influence or color her testimony, and if so, to what extent. All these considerations are for you.

A reasonable doubt is such a doubt as would cause a prudent man to hesitate and to pause before proceeding in affairs of importance relating to himself. If they have failed by that measure of proof, then the defendant is entitled to an acquittal; if you have no reasonable doubt, then it is just as much your duty to convict the defendant. You have in this case nothing to do with the costs.

[Now, same day, jury directed to return for further instructions.

Objected to. Counsel for defendant objects to any further instructions.

Gentlemen of the jury: In referring to the testimony of Bertha Fair I suggested to you that as I remembered the testimony, although you might remember it differently, she had said

that Jennie Hunter declared to her two days before they together came to Easton, that her use of the needle and the pencil had not been successful, and that she wanted to come down to Easton to get rid of her child. Since you retired I have had the stenographer examine the whole of the testimony upon that subject, and it shows that this conversation took place two days before Bertha Fair came to Easton the first time, which would be nine days before Jennie Hunter came down, and I will have that testimony read to you so that you may see exactly for yourselves what it is in that respect.] [4] Defendant excepts to the charge of the court before verdict, and requests the same to be reduced to writing and filed of record in the cause.

Bill sealed.

Verdict of guilty, defendant sentenced to pay a fine of $5.00 and undergo confinement in the penitentiary for four years. Defendant appealed.

*Errors assigned* were (1–9) to portions of the judge's charge, reciting same. (10) To ruling on evidence, reciting same.

*W. C. Shipman* and *H. J. Steele*, for appellant.—These two specifications may be disposed of together. The error is the same in both. It is the assumption by the court below of a disputed question of fact in the evidence whether the crime of abortion had been committed at all upon Jennie Hunter, which was the cause of her death.

Another assumption by the court is, that the puncture in the womb, which caused death, also caused abortion. No expert upon either side would say or could say that the instrument which caused the puncture also caused the abortion.

The assumption of the crime of abortion leaves no other hypothesis than that some person other than Miss Hunter caused the puncture, and excludes the other hypothesis which arises from the infliction of the wound by her own hand.

In the third assignment the court misdirected the jury upon a matter of fact, and then recalled the jury and made a correction, which will be found in the fourth assignment.

In Com. v. Switzer, 134 Pa. 383, Justice MITCHELL spoke of the impossibility of curing a dangerous error by correction of the trial judge.

In Com. v. Gerade, 145 Pa. 289, Chief Justice STERRETT speaks of the submission of a question correctly and incorrectly.

Jennie Hunter made contradictory statements in her two dying declarations. The judge apologized for these contradictions that such variations must exist in human testimony. But the Supreme Court has said differently: Com. v. Wentz, 161 Pa. 598.

In that part of the charge contained in the seventh assignment of error the judge below disposed of the most vital portion of the defense: Com. v. Silcox, 161 Pa. 484; Goersen v. Com., 99 Pa. 388; Com. v. Goldberg, 4 Pa. Superior Ct. 142.

The eighth assignment embraces two assumptions of fact by the court.

The rule admitting in evidence dying declarations was originally based in England upon what was regarded as the necessity of the case, or circumstances under which it arose. It was regarded as an exception to the rule against hearsay evidence, because of the solemnity of the circumstances, under which it was made, being equal to that which is afforded by the customary oath.

This has in many cases been considered a sufficient reason for concluding, that the constitutional provision under consideration was not intended to do away with the dying declaration rule: Hill v. Com., 2 Gratt. (Va.) 594, 607.

In Railing v. Com., 110 Pa. 100, it was held by the Supreme Court, in an elaborate opinion, that dying declarations are only admissible when the circumstances of the death are the subject of the charge; they are not admissible in a trial for abortion even though death has ensued.

It is, therefore, clearly established that under the law, as it existed, prior to 1895, dying declarations, for cases of abortion, were inadmissible. The legislature by Act of June 26, 1895, P. L. 387, attempted to change the law in this regard, and make such declarations admissible.

*James W. Fox,* with him *James T. Woodring,* district attorney, for appellee.—The proof on behalf of the commonwealth showed that Jennie Hunter, finding herself pregnant attempted to change her condition with drugs and failed. She begged her brother William Hunter to borrow the necessary money from Oscar

Kemmerer and take her to Easton to have an operation performed, threatening to kill herself if he did not, and telling him she had tried a lead pencil and then it hurt and she stopped.

Under the rule as laid down in Com. v. Railing, 110 Pa. 100, dying declarations as such were inadmissible in this state in indictments for abortion; their admissibility in homicide cases is expressly affirmed in Com. v. Railing, on the ground of the necessities of the case. The act of 1895 has extended the kind of cases in which they may be given in evidence, so as to include those in which the death of the woman follows and is caused by an operation intended to produce abortion. The Supreme Court of Indiana has held in Montgomery v. State, 3 Crim. Law Mag. 523, that such declarations are admissible in trials for abortion. The laws of Wisconsin make the offense manslaughter, and dying declarations are admissible in that state under the common-law rule.

The legislature of Massachusetts has thus amended its statute law and made such declarations admissible as they were at common law: Com. v. Bishop, 165 Mass. 148.

Can an act making competent testimony required for the due administration of justice in criminal cases be considered either special or local?

Legislation is only local when it applies to a specific locality or when its operation is not extended to every locality. It can scarcely be urged that this act does not apply to every part of the state.

Is it special?

It undoubtedly applies only to a certain definite crime, but it is to be remembered that this offense was formerly triable as manslaughter, and the legislature probably only intended to more accurately define it, and lessen the penalty for its commission: Report on Penal Code, 25. If the word manslaughter had been substituted for felony in the act of 1860, dying declarations would have been admissible and the act of 1895 would have been unnecessary. Its only purpose has been to restore the law to the same limits that it occupied before the decision of Com. v. Railing, so that it is really a restoration rather than a new provision. Mr. Justice PAXSON in Wheeler v. Phila., 77 Pa. 338, says such legislation is not special: Opening of Ruan St., 132 Pa. 257; Bennett v. Norton, 171 Pa. 221.

OPINION BY RICE, P. J., February 16, 1900 :

Whether or not Jennie Hunter was "pregnant or quick with child," and an instrument was used to procure her miscarriage in consequence of which she died were questions of fact, which, no matter how strong the evidence of the commonwealth may have been, it was the duty of the court to submit to the jury. We do not see how an intelligent and unbiased jury could have come to any other conclusion from the evidence than that these facts were proved; nevertheless the questions were for them. As the defendant's counsel correctly say, convincing proof that the wound revealed upon the post-mortem examination was the cause of death would not, of itself, compel the conclusion that it had resulted in a miscarriage. Hence, if the judge had instructed the jury that, if they found it was the cause of death, the only other question for their determination was whether it was inflicted by the defendant, he would have committed error. It is contended that this was the effect of the instructions complained of in the first and second assignments of error, but the earnest and able arguments of the defendant's counsel have failed to convince us that such is the case. The evidence that the female was pregnant was undisputed and overwhelming, and the evidence that an abortion had been produced, either by her own act or the act of some other person, was almost equally strong, even if her dying declarations be left out of consideration. It was undisputed, also, that the wound would produce an abortion; it was the theory of the defendant as well as of the commonwealth that it was inflicted in an attempt to accomplish that result; and it is scarcely supposable that it was inflicted for any other purpose. Under these circumstances it was not error for the judge to express even a very strong opinion that, if the testimony of the physicians was to be credited, an abortion had been produced either by the woman herself or by some other person, and that this was the cause of death. This was the entire effect of the instructions complained of, whether taken by themselves or read, as they ought to be, in connection with the context. It is often permissible and sometimes advisable for a judge in his charge to the jury to express an opinion upon the facts, provided he does it fairly and does not give a binding direction or interfere with the province of the jury. Many of the civil cases where this is recognized are col-

lected in Ginder v. Bachman, 8 Pa. Superior Ct. 405. Amongst the criminal cases may be mentioned Johnson v. Com., 115 Pa. 369, Com. v. Orr, 138 Pa. 276, Com. v. Van Horn, 188 Pa. 143, and Com. v. McGowan, 189 Pa. 641. Such comment as is here complained of is particularly unobjectionable where it simply leads the minds of the jurors up to the substantial matter of controversy, but without binding them to accept the judge's views as to the matters of fact concerning which there is no real conflict of evidence. Having expressed his opinion as to these latter matters of fact the learned judge stated the whole question fairly and adequately as follows : "If you determine that an abortion was committed by somebody, and that this was the cause of death, it then becomes necessary to determine by whose agency that result was accomplished." There was no expression of opinion upon the pivotal question, namely, whether it was produced by the pregnant female herself or by some other person, nor was the former hypothesis excluded from the consideration of the jury either expressly or inferentially. On the contrary, they were told more than once that if the deceased produced the abortion there could be no conviction, no matter what the defendant may have done afterwards. These assignments are overruled.

In the excerpt from his charge complained of in the third assignment the learned judge was strictly accurate except possibly as to the time when the alleged declarations were made. He did not intimate, either there or elsewhere in his charge, that the attempts spoken of had been unsuccessful, but only that Bertha Fair had testified that the deceased had so declared. Nor did his subsequent correction of his statement as to the time of these declarations call for any modification, which would have been favorable to the defendant, of his instructions contained in the fifth assignment. Indeed, it is not accurate to speak of these remarks as instructions ; they were simply inquiries fairly arising out of the testimony and properly suggested for the jury's consideration. They were as pertinent in view of the testimony of Bertha Fair as actually given as they would have been if her testimony as to the time of the declarations had been as the judge first stated it. It is difficult to see how the slight inaccuracy in stating the time when the declarations were made to Bertha Fair could have been prejudi-

cial to the defendant; it is impossible to see how it could have been after it was corrected. None of the cases cited by the defendant's counsel in support of these assignments sustain their contention that such a mere slip as this in the recital of evidence was an error of so great magnitude that it could not be cured. And, after a somewhat extended examination we feel warranted in saying that no well considered case can be found in which a general rule is laid down, or a precedent established which does sustain it. The third, fourth and fifth assignments are overruled.

Though the presumption that a witness has testified to the truth may be repelled by contradictions in his testimony, or may be removed by proof that he has made contradictory statements, yet as the jury have the exclusive right to weigh the testimony and to determine the facts, the question of his credibility must, notwithstanding discrepancies and apparent contradictions, be submitted to them. "Apparent inconsistencies and even contradictions in the testimony of witnesses do not necessarily imply wilful falsehood. As a general rule it is the safer and better course to instruct the jury that it is their duty to reconcile such discrepancies and contradictions, if it can be fairly and satisfactorily done, as it can in a great majority of cases. Failing in that, it is their duty, from all the light before them, to determine whether the witness should be believed by them or not. In other words, it is the province of the jury to pass upon the credibility of witnesses who testify before them:" Fullam v. Rose, 160 Pa. 47. The same general rule applies to dying declarations (Com. v. Mika, 171 Pa. 273), and with added force where the apparent discrepancies may have resulted from differences in recollection of the persons who heard them, and where as to the main fact the statements are consistent. The rule was correctly applied in the present case in the instructions complained of in the sixth assignment, which should be read in connection with what immediately precedes them, and with the answer to the defendant's fifth point. It was not the duty, nor within the province of, the court to declare that the two statements of Jennie Hunter were so inconsistent and irreconcilable in material particulars that neither was entitled to credence in any particular. It was the duty of the judge to

decide as to the admissibility of the declarations; it was the province of tne jury to pass on the credibility of the declarant.

Nor would the judge have been justified in saying to the jury that the testimony of the experts called by the defendant conclusively proved that it was impossible that the conditions described by Jennie Hunter in her two statements to her father and Dr. Fraunfelter, could have existed, and therefore they should acquit under the count of the indictment charging the use of an instrument. As one of these witnesses very pertinently said, " We deal with possibilities and probabilities, they are different things ; the probabilities are it would not remain, you cannot say what is possible." The most that could be required of the judge in the absence of request for particular instructions was that he state the defendant's contention as to the facts established by this testimony and their effect as contradictions of the statements of Jennie Hunter, and leave the question to the jury. This was done fairly, and, although not with elaboration, yet with sufficient emphasis to impress upon the jury the importance of the evidence, and its bearing upon the question of her credibility.

It was entirely proper in the same connection to refer to the attempt of the commonwealth to show upon cross-examination of one of these witnesses, " that some instrument if provided with certain appliances might be so used." The judge did not say nor intimate that this attempt of counsel was successful, and a careful perusal of the cross-examination of this witness has failed to convince us that he would have been warranted in saying that it was wholly unsuccessful.

It is urged that it was error to charge that an arrangement had ever been made for the confinement of Jennie Hunter at defendant's house; but this complaint is based on a misconception of the judge's charge. What he said was, that it appeared in the testimony of the defendant herself that it was arranged that Jennie Hunter should come to her house for the purpose of being confined in the usual way. If this was not a substantially accurate statement we confess that we do not understand her testimony. The inquiries suggested in the same connection for the jury's consideration were pertinent; they arose fairly out of the evidence, and doubtless would have occurred to the minds of the jurors even if they had not been suggested by the

judge.   This mode of directing the attention of the jury to the question of the probability or improbability of an assertion of fact is customary and not necessarily improper: McLain v. Com., 99 Pa. 86.   See also McNeile v. Cridland, 6 Pa. Superior Ct. 428.   It may be abused, it is true, and be used as a thin disguise for a partisan argument in favor of the theory of one side or the other, which, however permissible for the advocate, is not so for the judge.   But we find nothing of that kind in this case.   A charge to be fair and impartial must not necessarily be colorless and carefully avoid reference to damaging facts.

As we read the charge, the learned judge did not assume that the defendant had fled, but only that this fact was alleged by the commonwealth, and in the same connection he stated the defendant's explanation of her going to New York.   This latter part of the charge is not quoted in the assignment of error, but reading the judge's remarks upon this subject as a connected whole (see K. of P. v. Leadbeter, 2 Pa. Superior Ct. 461, and cases there cited) it will be seen that the jury were left free to determine the question of fact and its weight, if established, as a corroborating circumstance.   The sixth, seventh and eighth assignments are overruled.

Dying declarations are only admissible when made by a person who is under the influence of an impression that his dissolution is impending.   This is a preliminary fact to be proved by the party offering them in evidence, and the proof offered for this preliminary purpose is addressed in the first instance to the conscience of the court.   It need not be proved that the declarant stated in so many words that his statement was made under a sense of impending death.   It is enough if it appears satisfactorily in any legitimate mode that it was made under that sanction : 1 Gr. Ev. sec. 158.   " The belief of a sudden dissolution is the test by which the competency of dying declarations is to be measured:" Sullivan v. Com., 93 Pa. 284. " In order to judge whether or not such was the state of mind of the person in question the whole of the circumstances must be looked at:" Roscoe's Cr. Ev. (10th ed.) 34.   This is the doctrine of the Pennsylvania cases: Kilpatrick v. Com., 31 Pa. 198 ; Small v. Com., 91 Pa. 304.   As we have already suggested, this question and the question whether the declarant was of sound mind were primarily for the court.   Whether exclusively

for the court or not they were questions of fact, and after a careful examination of the evidence we cannot say that the facts essential to the admission of the ante-mortem statements were not proved by competent and sufficient evidence.

The instructions to the jury upon this subject taken as a whole seem to us full and impartial and free from error. What the learned judge said upon the question of the soundness of mind of the declarant is supported by the authorities: Com. v. Straesser, 153 Pa. 451; Com. v. Silcox, 161 Pa. 484. He correctly and concisely summed up the requirements as follows: "But before they" (the declarations) "can receive consideration at all at your hands you must be satisfied that she knew the extreme peril of her situation, and believed death to be certain and dissolution near; that she was conscious of her surroundings; that she answered the questions responsively and intelligently with knowledge of their effect and recollection of the events." The ninth assignment is overruled.

It is to be observed that the defendant's requests for special instructions were all granted. When, in such a case, the complaint is, that the charge was inadequate or one-sided, and particular error of law or material misstatement of the evidence cannot be pointed out, the court will be reviewed on the general effect of the charge, and not upon sentences or paragraphs disconnected from the context which qualifies and explains them; if, as a whole, the charge was calculated to mislead there is error in the record; if not there is none: McNeile v. Cridland, 6 Pa. Superior Ct. 428; Ginder v. Bachman, 8 Pa. Superior Ct. 405. In reviewing the assignments of error in the charge we have, perhaps, gone more into detail than was necessary. We are convinced that none of them contains reversible error, and we are wholly unable to agree with the learned counsel that a reading of the entire charge will leave the impression that the defense was slighted and the prosecution magnified. An entirely different impression has been left on our minds notwithstanding the very vigorous criticism of counsel. We are of opinion that it was neither one-sided nor inadequate, and that the exceptional cases where there has been a reversal upon either of those grounds do not apply. The remarks of Mr. Justice MITCHELL in Commonwealth v. Kaiser, 184 Pa. 493, may be appropriately quoted. "It is complained that here and there

items that bore in favor of prisoner were not especially mentioned.   It is probable that the commonwealth might make the same complaint.   It is not possible nor even desirable that the judge should refer to and emphasize every item of evidence on both sides in a way that the counsel would consider adequate. In doing so he would run much risk of coming to speak as an advocate rather than a judge.   Nor is he required to go over all the evidence on any particular point every time he refers to the point in the course of his charge.   It is enough if he gives to the jury a general review of the evidence on the one side and the other, which fairly and adequately presents the respective contentions of the parties, with enough reference to the items of evidence to assist the jury in recalling it as a substantial whole, and to appreciate its bearing."   The charge delivered by the learned judge in the case at bar comes fully up to this standard.

It is argued in support of the tenth assignment that the Act of June 26, 1895, P. L. 387, entitled " An act, making dying declarations competent in prosecutions for criminal abortions and attempted abortions, where the subject shall die in consequence of such unlawful acts," is unconstitutional and void because it violates section 7, article 3, which prohibits the passage of any " local or special law, . . . . changing the rules of evidence in any judicial proceeding or inquiry before courts," etc., also because it conflicts with the constitutional right of the accused " to meet the witnesses face to face."

In Ayars's Appeal, 122 Pa. 266, Chief Justice STERRETT said that " the underlying principle of all the cases is that classification, with the view of legislating for either class separately, is essentially unconstitutional, unless a necessity therefor exists, a necessity springing from manifest peculiarities, clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class separately, that would be useless and detrimental to the others. Laws enacted in pursuance of such classification and for such purposes are, properly speaking, neither local nor special.   They are general laws, because they apply alike to all that are similarly situated as to their peculiar necessities."   If this be true of laws enacted pursuant to a classification made by the legislature, with the view of legislating for each class separately, it

must be equally true of laws enacted for existing classes distinguished one from the other by manifest peculiarities, where, by reason of such peculiarities, legislation that might be demanded for one class would be wholly unnecessary and inappropriate for the others. The act of 1895 comes fairly within this well recognized principle. It was not enacted to meet the exigencies of a particular case—which, probably, was the kind of vicious legislation the framers of the constitution had specially in view—but, with a manifestly proper qualification, it applies alike to the trial of all prosecutions in which the particular crime is charged. It is true it does not apply to all prosecutions in which the fact of the death of any person is in issue—as, for example, where the charge is that the child with which the woman was quick died in consequence of the criminal act—but only to cases where it is charged that the woman died in consequence of the criminal act. But surely this limitation of the operation of the act to this exceptional class of cases, to the exclusion of those in which the legislature had not power to make the evidence competent, does not make it a special law, within the true intent and meaning of the constitutional provision.

One of the exceptions to the common-law rule rejecting hearsay evidence is allowed in the case of dying declarations. The exception is as old as the rule itself, and it has uniformly been held that it was not abrogated by express provisions of constitutional law which secure to the person accused of a crime the right to be confronted with the witnesses against him.

Different reasons for this conclusion have been given (see People v. Corey, 157 N. Y. 332, 347, Hill v. Commonwealth, 2 Gratt. (Va.) 607, State v. Houser, 26 Mo. 431, and Brown v. Com., 73 Pa. 321), but we are not called upon to discuss them. It is sufficient for present purposes to say that it is well settled that the rule, as it existed at common law, is not in conflict with our bill of rights; therefore, an act confined in its operation to cases within the common-law rule cannot be in conflict with it. At the common law the crime charged in this indictment was felonious homicide and punishable as such. In Commonwealth v. Keeper, 2 Ash. 227, Judge KING said: " Of the legal character of the offense, if proved as charged, no doubt can be entertained. One of the most learned and humane

sages of the common law, SIR MATTHEW HALE, gives the following as the doctrine ruled by him at Bury assizes in 1670 : 'If a woman be with child, and any gives her a potion to destroy the child within her, and she takes it and it works so strongly that it kills her, this is murder; for it was not to cure her of a disease, but unlawfully to destroy her child within her; and, therefore, he that gives a potion to this end must take the hazard, and if it kills the mother it is murder.'" He also cites Tinkler's Case, 1 East. P. C. ch. 5, sec. 17. See also 4 Lewis's Bl. Com. 201, State v. Dickinson, 41 Wis. 299, and Peoples v. Com., 87 Ky. 487, 492. In a prosecution for homicide, as such, committed by performing an abortion, the dying declarations of woman as to the abortion, i. e., the cause of death, are admissible : Simons v. People, 150 Ill. 66 ; State v. Leeper, 70 Iowa, 748 ; State v. Baldwin, 79 Iowa, 714 ; Peoples v. Com., supra; State v. Dickinson, supra. But the crime cannot be so prosecuted in this commonwealth because, and only because, it has been made a statutory offense. "Thus section 87 took the crime therein specified out of the class designated as murder, and made it a felony of lesser grade, and prescribed the punishment therefor. Hence no penalty therefor shall be inflicted or anything be done in punishment thereof otherwise than as directed by said section : " Com. v. Railing, 113 Pa. 37. As the "dying declaration" rule was strictly confined at common law to prosecutions for homicide, when the crime was put into another class by statute, and is no longer indictable as homicide, it was taken out of the operation of the rule, and the declarations were no longer admissible in evidence. This question was thoroughly discussed by the present chief justice in the Railing case, when it went up the first time (110 Pa. 100), and the inadmissibility of the declarations in a prosecution for the statutory offense was conclusively shown. But it will be seen that he nowhere alludes to the provision of the bill of rights as being a bar to the admission of the evidence in cases of criminal abortion resulting in the death of the victim. Nor does he intimate that if the statute relative to that crime had not been enacted it could not be prosecuted as a felonious homicide, nor that the dying declarations of the woman were not admissible in such prosecution, i. e., for homicide, at common law. That case was decided ten years before the passage of the act of

1895, and of course the question that is now presented did not arise, nor was it discussed in the opinion.   The question is, not whether the legislature had power to extend the dying declaration rule to cases that never were within it, but whether it was prohibited from declaring that it shall apply to cases which are within its reason and were within its very letter until the legislature reduced the crime from felonious homicide to a felony of a lesser grade.   The statute was passed for a wise purpose, and because it had been demonstrated by experience that the same reason which lies at the foundation of the rule under which dying declarations are admitted in homicide cases still exists for the admission of such testimony in the prosecution of indictments for criminal abortion resulting in death, notwithstanding the fact that the crime is no longer felonious homicide : Com. v. Keen, 7 Pa. Superior Ct. 293.   We are not convinced that the legislature had not power to make the evidence admissible, as has been done in other states.   See Com. v. Homer, 153 Mass. 343, Com. v. Thompson, 159 Mass. 56, and Com. v. Bishop, 165 Mass. 148.

The judgment is affirmed, and it is ordered that the record be remitted to the end that the sentence be fully carried into effect, and it is further ordered that the defendant forthwith surrender herself to the warden of the penitentiary for the eastern district of Pennsylvania, and serve out so much of the period of imprisonment prescribed by said sentence as had not expired on June 30, 1899, the day the supersedeas on this appeal took effect.